DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Petitioner,

v.

BETHLEHEM MINES CORPORATION, and Pauline Fleming (Widow of Harry L. Fleming), Respondents.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Petitioner,

v.

CONSOLIDATION COAL COMPANY, and Leonard Slevin, Respondents.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Petitioner,

v.

CONSOLIDATION COAL COMPANY, and Employers Service Corporation, and Thelma Iser (Widow of Aubrey C. Iser), Respondents.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Petitioner,

v.

HAWLEY COAL MINING CORPORATION, and Abraham L. Christian, Respondents.

Nos. 81–1191 to 81–1194.

United States Court of Appeals, Fourth Circuit.

Argued July 14, 1981.

Decided Jan. 14, 1982.

Virginia C. Smith, U. S. Dept. of Labor, Washington, D. C. (T. Timothy Ryan, Jr., Sol. of Labor, Cornelius S. Donoghue, Jr., Acting Associate Sol., Washington, D. C., Judith E. Kramer, Co-Counsel for Black Lung Benefits, Washington, D. C., on brief), for petitioner.

Charles M. Surber, Jr., Charleston, W. Va. (J. Randolph Query, III, Robert J. Busse, Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., on brief), J. Scott Leckie, Pittsburgh, Pa. (Mark Solomons, John Kilcullen, Kilcullen & Kilcullen, Washington, D. C., on brief), for respondents.

Before PHILLIPS, MURNAGHAN and ERVIN, Circuit Judges.

MURNAGHAN, Circuit Judge:

We are here presented with a difficult issue of interpretation of § 435 of the Black Lung Benefits Reform Act of 1977, 30 U.S.C. § 945. The question is whether certain claims for black lung disability benefits filed before June 30, 1973 are to be paid by the individual coal mine operator responsible for the disability, or are to be paid from the Black Lung Disability Trust Fund.

## I.

The Director, Office of Workman's Compensation Programs, seeks consolidated review of four decisions of the Benefits Review Board awarding benefits to claimants for disability or survivor's benefits. Each claim originally was filed with the Department of Health, Education and Welfare (HEW)[1] before June 1, 1973, and denied. After enactment of the Black Lung Benefits Reform Act of 1977, 30 U.S.C. § 901 et seq., the Secretary of HEW reconsidered and approved each claim, and, pursuant to § 945, certified approval to the Secretary of Labor for payment. The Secretary of Labor identified an operator responsible for each disability, and ordered the operator to pay benefits. Each operator refused payment, and each claim was referred to an administrative law judge for hearing. The claims were controverted on the merits. Three of the claims were upheld, but the claim of the fourth claimant, Thelma Iser, was denied. In each case upholding the claim, the administrative law judge held the coal mine operator responsible for payment of the benefits.

The operators held responsible in the three decisions approving claims, and claimant Iser appealed to the Benefits Review Board. Relying on its earlier decision in Yakubco v. Republic Steel Corp., 2 BLR 1–1116 (1980), appeal docketed sub. nom. Director, Office of Workers' Compensation Programs v. Republic Steel Corp., 663 F.2d 8 (3d Cir. 1981), the Review Board held that the Black Lung Disability Trust Fund, rather than individual coal mine operators, was responsible for the payment of benefits and attorneys' fees. The Board also reinstated Iser's claim, holding that the Secretary of HEW's certification of eligibility was binding on the Department of Labor, and could not be contested on appeal. The Board, in a manner consistent with its decision in the other three cases, also held that the Black Lung Disability Trust Fund, not the coal mine operator, was responsible for Iser's benefits.

---

1. To be consistent with references in the legislative history and earlier proceedings, this opinion will refer to HEW rather than the Department of Health and Human Services.

The Director, Office of Workers' Compensation Programs, appeals.

## II.

Title IV of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 901 *et seq.*, divided claims for black lung disability benefits into two categories: Part B and Part C. Part B of the Act, 30 U.S.C. § 921 *et seq.*, governed all claims for benefits filed on or before December 31, 1972. Part B claims were adjudicated by the Department of HEW; if approved, benefits were paid out of general revenues of the Treasury. *See* 30 U.S.C. § 922 (1969) (amended 1977).

Part C of the Act, 30 U.S.C. § 931 *et seq.*, governed claims for benefits filed after December 31, 1972. Section 931 of the Act required that Part C claims first be filed with an appropriate state agency if the claim arose in a state with a workmen's compensation law that met federal standards. If the claim arose in a state where the workmen's compensation law did not meet federal standards, the claim was to be filed with the Department of Labor. If the Department of Labor approved the claim, the Department was to identify a coal mine operator responsible for the disability. The coal mine operator was to be liable for payment of black lung disability benefits. *See* 30 U.S.C. § 932 (1969) (amended 1977). If no responsible operator could be identified, benefits were to be paid out of general Treasury revenues. *See* 30 U.S.C. § 934 (1972) (amended 1977).

The distinction between Part B and Part C claims was intended to effect several policies. Congress wanted to compensate miners totally disabled by black lung disease, but limit federal involvement in the compensation program. Part C of the Act was designed to place primary responsibility for payment of benefits on the states and on the coal mine industry. Only if a state failed to enact a satisfactory workmen's compensation law and no responsible operator could be identified were payments to be made from general Treasury revenues. *See* 30 U.S.C. § 934 (1969) (amended 1977).

At the time the 1969 Act became effective, no state workmen's compensation law adequately compensated black lung disease. Until states enacted adequate workmen's compensation laws, the burden for all black lung benefits under Part C would rest with individual coal mine operators. Congress apparently concluded that, because the 1969 Act imposed new mine health and safety standards without prior notice, it would be unfair to make operators responsible for benefits until they had a reasonable opportunity to comply with the standards.[2] *Cf.* H.R.Rep. 95–151, 95th Cong., 2d Sess. 10, *reprinted in* [1978] U.S.Code Cong. & Ad. News 237, 246. Part B of the Act therefore provided that benefits for all claims filed on or before December 31, 1972, would be paid from general Treasury revenues. *See* 30 U.S.C. § 922 (1969) (amended 1977).

The Black Lung Disability Benefits Act of 1972, amending Title IV of the Federal Coal Mine Health and Safety Act of 1969, maintained the distinction between Part B and Part C claims. Because many more persons had filed claims for benefits than Congress anticipated, resulting in a huge backlog of claims, Congress extended federal responsibility for benefits one year. The 1972 Act amended Part C to make operators responsible only for claims filed after December 31, 1973.[3] *See* S.Rep.No. 92–743,

---

2. The policy is reflected in the Black Lung Benefits Reform Act of 1977. Section 424(a)(2), 30 U.S.C. § 934(a)(2), makes the black lung disability trust fund responsible for all benefits where employment ended before the effective date of the 1969 Act, Dec. 31, 1969. Consequently, this appeal only concerns Part B claims where employment continued after Jan. 1, 1970.

3. The 1972 amendments added a third category of claims, § 415 claims. Section 415, 30 U.S.C. § 925, applied to claims filed during the transition period between Part B and Part C (June 30, 1973 through December 31, 1973). Section 415 provided that the federal government would pay benefits until December 31, 1973 for all claims filed after June 30, 1973. Beginning January 1, 1974, the responsible operator was to pay all benefits for claims thereafter filed. Section 415 is not at issue here.

92d Cong., 2d Sess., 5–7 *reprinted in* [1972] U.S.Code Cong. & Ad.News, 2305, 2309–11.

Once in effect, the Black Lung Disability Benefits Act of 1972 met with difficulties. First, the Act failed to extricate the federal government from responsibility for benefits. No state enacted a workmen's compensation law that met federal standards, and the Department of Labor identified responsible operators only in about 25 to 30 percent of the claims. Consequently, benefits for the large majority of Part C claims were paid from general Treasury revenues. *See* H.R.Rep.No. 95–151, 95th Cong., 1st Sess. 21 (1977), *reprinted in* [1978] U.S.Code Cong. & Ad.News 237, 257. Second, HEW and the Department of Labor interpreted eligibility requirements differently, and often too restrictively. Many claims which should have been approved were denied. *See* H.R.Rep.No. 95–151 at 5.

The Black Lung Disability Reform Act of 1977 was enacted primarily to resolve those problems. Section 424(a) of the Act, 30 U.S.C. § 934(a), established a Black Lung Disability Trust Fund in the Treasury. The fund was supported by an excise tax on the sale of coal, and was to pay benefits where no adequate state workmen's compensation law existed and no responsible coal mine operator could be identified. *See* 30 U.S.C. § 934. The purpose of the fund was to shift responsibility for benefits once and for all from general Treasury revenues to the coal mine industry.

The 1977 Reform Act also amended eligibility requirements to ensure that HEW and the Department of Labor evaluated claims by the same standards, and evaluated them correctly. *See* 30 U.S.C. § 902. More important for our purposes, the 1977 Reform Act established procedures by which previously denied Part B and Part C claims could be reevaluated according to proper eligibility requirements. The procedure appears at § 435 of the Act, 30 U.S.C. § 945, which states:

> Section 435(a)(1). The Secretary of Health, Education, and Welfare shall promptly notify each claimant who has filed a claim for benefits under part B of this title and whose claim is either pending on the effective date of this section or has been denied on or before that effective date, that, upon the request of the claimant, the claim shall be either—

> (A) reviewed by the Secretary of Health, Education, and Welfare under paragraph (2) for a determination based on the evidence on file, taking into account the amendments made by the Black Lung Benefits Reform Act of 1977; or

> (B) referred directly by the Secretary of Health, Education, and Welfare to the Secretary of Labor for a determination under paragraph (3), with an opportunity for the claimant to present additional medical or other evidence in accordance with that paragraph, taking into account the amendments made by the Black Lung Benefits Reform Act of 1977.

> (2)(A). The Secretary of Health, Education, and Welfare shall approve forthwith each claim for which review is requested under paragraph (1)(A) if, based upon the evidence on file, the provisions of part B of this title, as amended by the Black Lung Benefits Reform Act of 1977, require such approval. The Secretary of Health, Education, and Welfare shall certify such approval to the Secretary of Labor and such approval shall be binding upon the Secretary of Labor as an initial determination of eligibility. Upon receipt of that certification, the Secretary of Labor shall immediately make or otherwise provide for payment of the claim *in accordance with this part.*

> (B)(i) The Secretary of Health, Education, and Welfare shall refer to the Secretary of Labor any claim not approved under subparagraph (A) for a determination under paragraph (3), and shall notify the claimant of that referral to the Secretary of Labor for such a determination.

> (ii) The Secretary of Health, Education, and Welfare shall notify each claimant whose claim has been approved under subparagraph (A) that, if the claimant disputes the scope or terms of the award, such dispute shall be referred to the Sec-

retary of Labor for a determination under paragraph (3).

(C) Upon the completion of the review of any claim by the Secretary of Health, Education, and Welfare under this paragraph, the responsibility for further action with respect to such claim shall be transferred to the Secretary of Labor. The Secretary of Labor shall consider each such claim in accordance with paragraph (3).

(3)(A) Except as provided in this section, the Secretary of Labor shall treat each claim referred by the Secretary of Health, Education, and Welfare under paragraph (1)(B) or (2)(B) as if it were a claim filed under this part. The provisions of subsection (b) shall apply to any determination of the Secretary with respect to any such claim referred to the Secretary.

(B) The Secretary of Health, Education, and Welfare shall promptly furnish to the Secretary of Labor all pertinent information in the possession of the Department of Health, Education, and Welfare relating to claims referred to the Secretary of Labor under this subsection.

(4) For the purposes of any determination by the Secretary of Labor under paragraph (3), the date of the request under paragraph (1) shall be considered the date of filing of the claim.

(b)(1) The Secretary of Labor shall review each claim which has been denied under this part (or under section 415) on or before the effective date of this subsection, and each claim which is pending under this part (or under section 415) on such effective date, taking into account the amendments made to this part by the Black Lung Benefits Reform Act of 1977. The Secretary shall approve any such claim forthwith if the provisions of this part, as so amended, require that approval, and the Secretary shall immediately make or otherwise provide for the payment of the claim in accordance with this part.

(2)(A) The Secretary, in carrying out the review of any claim under paragraph (1) and in making any determination un-

der subsection (a)(3), shall not require any additional medical or other evidence to be submitted if the evidence on file is sufficient for approval of the claim, taking into account the amendments made to this part by the Black Lung Benefits Reform Act of 1977.

(B) If the evidence on file is not sufficient for approval of the claim, the Secretary shall provide an opportunity for the claimant to present additional medical or other evidence to substantiate his or her claim and shall notify each claimant of that opportunity.

(c) Any individual whose claim is approved pursuant to this section shall be awarded benefits on a retroactive basis for a period which begins no earlier than January 1, 1974.

Briefly, review of a previously denied or pending Part B claim can be reviewed under § 435 in one of three ways: (1) the Secretary of HEW can review the claim based on evidence in the file; if *approved*, the claim is forwarded to the Secretary of Labor to make or otherwise provide for payment, *see* (a)(1)(A), (a)(2)(A); (2) the Secretary of HEW can review the claim based on evidence in the file; if *denied*, the claim is forwarded to the Secretary of Labor and the claimant is given an opportunity to present additional evidence, *see* (a)(2)(B)(i), (a)(3)(A), (b)(2)(B); (3) a claimant can request the Secretary of HEW to forward the claim directly to the Secretary of Labor for review, which provides the claimant an opportunity to present additional evidence, *see* (a)(1)(B), (a)(3)(A), (b)(2)(B).

### III.

The mine operators concede that any Part B claim in categories (2) or (3) will be treated "as if it were a" Part C claim. *See* (a)(3)(A). Section 945 is found in Part C. This is the case although the claim was filed before December 31, 1973. At issue here are solely Part B claims which fell in category (1); they were approved by HEW and certified to the Secretary of Labor for pay-

ment of benefits. In *Yacubco v. Republic Steel Corp.*, the Benefits Review Board interpreted § 435 and related sections to require the Black Lung Disability Benefits Fund, not individual operators, to pay benefits for Part B claims approved by HEW. The Board based this conclusion on a distinction § 435(a)(3)(A) draws between Part B claims approved by HEW and Part B claims either denied by HEW or referred directly to the Secretary of Labor for review, and ultimately approved by him. We have observed that subsection (a)(3)(A) expressly confers Part C status on claims referred to and reviewed and approved by the Secretary of Labor. No language appears in § 435 conferring "treated as" or "deemed" Part C status on cases where there is approval by the Secretary of HEW, rendering referral to the Secretary of Labor for review unnecessary.

In *Yacubco* the Board found that, in such a posture, § 435 implied that Part B claims approved by HEW are not to be treated as Part C claims, but exclusively as Part B claims, notwithstanding that Part B claims referred directly, or indirectly after denial by HEW, to the Secretary of Labor are to be treated as Part C claims. The Board noted that the 1972 Act made operators responsible only for Part C claims, and that the 1977 Reform Act did not alter the structure of the 1972 Act between Part B and Part C. The Board therefore concluded that "operators are still liable only for claims filed under Part C of the Act."

The Board found that several other provisions of § 435 supported its conclusion. The Board noted that, if the Secretary of HEW approves the claim based upon evidence in the file, subsection (a)(2)(A) directs the Secretary to certify approval of the claim to the Secretary of Labor. HEW's approval of the claim is "binding upon the Secretary of Labor as an initial determination of eligibility," and the Secretary of Labor "shall immediately make or otherwise provide for payment of the claim in accordance with this part." The fact that HEW's determination of eligibility is "binding" on the Secretary of Labor and the Secretary is to make payment "immediately

. . . in accordance with this part" implies that no further adjudication of the claim occurs after HEW determination of eligibility. Because an operator has no opportunity to contest the claimant's eligibility or the operator's liability, the operator cannot be responsible for payment. Payment "in accordance with this part," the Board concluded, must mean payment from the trust fund. The trust fund is established in Part C of the Act, and is directed to pay benefits when no operator is required to pay benefits. *See* 30 U.S.C. § 934.

Not surprisingly, the Director, Office of Workers' Compensation Programs, interprets § 435 and related sections very differently. The Director argues that the 1977 Reform Act did alter the structure of the 1972 Act with regard to payment of benefits. The Director argues that all Part B claims reviewed under § 435, whether category (1), category (2), or category (3), are to be subject to Part C payment procedures, which includes identifying a responsible operator and providing the operator an opportunity to controvert.

The Director bases his interpretation of § 435 primarily on language in (a)(2)(A) directing the Secretary of Labor to "immediately make or otherwise provide for payment [of Part B claims approved by HEW] in accordance with this part." The Director interprets "make" payment to authorize payment from the trust fund, and "otherwise provide for payment" to authorize the Secretary to identify a responsible operator and order the operator to begin paying benefits.

The Director also argues that (a)(2)(A) contemplates further adjudication of a claim after HEW approves eligibility. Where the Benefits Review Board emphasizes that HEW's determination of eligibility is "binding" on the Secretary of Labor, the Director emphasizes that the determination of eligibility is merely binding "as an initial determination of eligibility." If HEW approves a claim, the Secretary of Labor is not to reconsider the medical or other evidence in the file, but is to immedi-

ately place the claimant on interim benefits pending final adjudication of the claim, should it be controverted.[4]

The Director recognizes that (a)(3)(A) distinguishes between claims approved by HEW and claims either denied by HEW or referred directly to the Secretary of Labor. The Director argues, however, that the distinction is confined to procedures for review of the claims, and was not intended to extend to payment of the claims. According to the Director, (a)(3)(A) directs the Secretary of Labor to treat (1)(B) and (2)(B) claims as though they were filed under Part C to ensure that the Secretary reviews those claims *de novo*, and gives the claimant an opportunity to present additional evidence.[5] Although Part B claims approved

4. The Director's interpretation of "initial determination" becomes clearer in the context of procedures promulgated by the Department of Labor for review of claims for black lung benefits. The procedures for review of Part C claims appear at 20 C.F.R. Part 725. The procedures for review of previously denied Part B and Part C claims appear at 20 C.F.R. Part 727.

After a claim is filed under Part C, a deputy commissioner is to develop evidence and process the claim. 20 C.F.R. § 725.401, .404–09. Based upon the evidence developed, the commissioner is to make an initial finding of eligibility. 20 C.F.R. § 725.410. At any time during processing, the deputy commissioner may identify and notify a coal mine operator who may be liable for payments. § 725.412. If the operator controverts the claim, the operator is to develop rebuttal evidence. § 725.414–15. The deputy commissioner then is to take appropriate action for final determination of the claim. This may include conducting a conference with the parties, issuing a proposed decision and order (with an opportunity for the parties to comment), forwarding the claim to an administrative law judge, or conducting a hearing. § 725.415–22 and Subpart E. After the deputy commissioner makes an *initial* determination of eligibility, the commissioner is to order the operator to begin payment of interim benefits within 30 days. If the operator refuses payment, the commissioner is to authorize interim payments from the trust fund, with the operator to reimburse the fund if the operator remains liable after a final determination of eligibility. *See* §§ 725.420, .525.

The Secretary of Labor has adopted a similar regulation for review of Part B claims, with one major difference. If HEW has made an initial determination of eligibility, that determination is binding on the deputy commissioner. The deputy commissioner is not to process the claim and develop evidence, but immediately to authorize payment of interim benefits from the trust fund. After authorizing payment, the commissioner is to review the claim and determine the amount of benefits the claimant should receive. The commissioner also is to identify and notify an operator who may be liable for payment. The operator then may contest the claim in the same manner that the operator would contest a Part C claim. If the operator is found liable for benefits, the opera-

tor is to reimburse the trust fund for interim payments. *See* 20 C.F.R. § 727.105.

5. The employers place particular emphasis on the use of the word "filed" in (a)(3)(A), because the filing date, for purposes other than those of § 435, determines whether a claim is a Part B or a Part C claim. *See Clayton Coal Co. v. Liberty Mutual Ins. Co.*, 594 F.2d 1378 (10th Cir. 1979). But the question which concerns us here is not whether claims approved by HEW are Part B claims or Part C claims; certainly they are Part B claims. All were filed before December 31, 1973. The question is whether the 1977 Reform Act requires the Part B claims to be treated as Part C claims for purposes of payment. The word "filed" is consistent with either answer. If the 1977 Reform Act dissolves the distinction between payment of Part B and Part C claims, as the Director argues, then the word "filed" would indicate simply that claims denied by HEW or referred directly to the Secretary of Labor are to be reviewed according to Part C procedures, while claims approved by HEW are not.

The employers also argue that the Director's interpretation of § 435 creates an anomaly, because it makes an operator liable for claims which the operator is not required to secure. Citing *Rockwood Insurance Co. v. Ragliani Coal Co.*, 2054 C.D. 1980 (March 30, 1981), an unpublished opinion of the Court of Common Pleas of Indiana County, Pennsylvania, they argue that the Director's interpretation makes operators liable for claims which they cannot secure (*Rockwood* interpreted a particular insurance policy not to cover claims approved by HEW under § 435).

Without addressing the merits, we simply note that *Rockwood* was based in large part on a reading of § 435 consistent with *Yacubco*. Nothing in the language of § 932 or § 933 states that an operator is required to secure claims filed under Part C or § 415 only. Section 933 states simply that if no adequate state workmen's compensation law exists, an operator "shall secure the payment of benefits for which he is liable under § 932 of this title." Section 932(a) states that during "any period after Dec. 31, 1973," in which an adequate state workmen's compensation law does not exist, the provisions of the Longshoremen's and Harbor Workers' Compensation Act "shall

by HEW are not to be reviewed *de novo*, they are to be paid "in accordance with this part," i.e. Part C (a)(2)(A). (Just as, under (b)(1), claims approved by the Secretary of Labor are to be paid "in accordance with this part.")[6]

## IV.

The purpose of statutory construction, of course, is to give effect to the intent of Congress. The language of a statute, if it plainly reveals legislative intent, governs. *See Rubin v. United States*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981); *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). As the dramatically differing interpretations of § 435 demonstrate, the language of this tangled and confusing statute is anything but plain. The statute never directly addresses the question of operator responsibility for Part B claims approved by HEW, and different provisions support different conclusions. We are not certain that some provisions of § 435 are not inherently at odds, but we do conclude that the Director's interpretation

better reconciles the provisions of the section. For one thing, neither the Benefits Review Board in *Yacubco* nor the employers here offer a satisfactory explanation of "make or otherwise provide for payment" in (a)(2)(A). Assuming that to "make" payment and to "otherwise provide for payment" are not redundant statements, we agree with the Director that (a)(2)(A) directs the Secretary to authorize payments from the trust fund or to identify a responsible operator and require the operator to make payment. Precisely the same language appears in § 435(b)(1), which concerns review of previously denied Part C claims. Unquestionably the Secretary of Labor is to identify a responsible operator in reviewing and approving previously denied true Part C claims under (b)(1), and we think the use of the same language in (a)(2)(A) contemplates the same procedure. No other reasonable interpretation suggests itself.[7]

The Director also reconciles more satisfactorily the "initial" yet "binding" nature

be applicable to each operator of [a] coal mine." Section 932(b) states that during "any such period each such operator shall be liable for and shall secure the payment of benefits, as provided in this section and section 933 of this title." Read together, § 932 and § 933 state only that, after Dec. 31, 1973, operators must secure the payment of benefits for which they are liable. The sections do not say that operators are liable only for Part C and § 415 claims. Sections 932 and 933 are equally consistent with either interpretation of § 435.

**6.** For those purposes, consequently, the statute dictates that claims approved by HEW be treated as if they were Part C claims.

At oral argument, counsel for the Director altered the interpretation of (a)(3)(A) slightly. Counsel noted that, read closely, (a)(3)(A) directs the Secretary of Labor to treat (1)(B) and (2)(B) claims as Part C claims "[e]xcept as provided in this section [§ 435]." Counsel read (a)(3)(A) to distinguish (1)(B) and (2)(B) claims not from Part B claims approved by HEW, but from true Part C claims. Initial review of true Part C claims is based upon evidence in the file; (a)(3)(A) ensures that the Secretary will not review (1)(B) and (2)(B) claims as he would review true Part C claims, but will grant review *de novo*, with an opportunity for a claimant to present additional evidence. Part B claims approved by HEW are not mentioned in (a)(3)(A), the Director's interpretation continues, because they do not require *de novo* review. But Part B

claims approved by HEW are to be paid "in accordance with this part," i.e. Part C. Fortunately, the issue here does not require us to resolve the hermeneutics of (a)(3)(A). Whatever the precise reading, it is enough that it is convincingly demonstrated that any distinction between categories (1), (2), and (3) contained in the statutory language is intended to apply only to review procedures. It does not reach the payment of claims, and specifically does not extend to the source of payment.

**7.** The employers argue that to "make" payments cannot refer to payments from the trust fund, because the Secretary of Labor cannot "make" payments from the trust fund. The Secretary can only "authorize" payments from the trust fund; the Secretary of the Treasury "makes" payments from the trust fund. The employers argue that to "make" payments refers to Pub.L. 95–239, § 20(b) (30 U.S.C. § 934a note). The section directs the Secretary to "make" payments to claimants and their survivors in accordance with the law in effect before the enactment of the 1977 Reform Act, in the event legal challenges or other circumstances prevent payments from the trust fund. The employers argue that to "otherwise provide for payment" therefore refers to payments from the trust fund. We think the argument is overly subtle, and contorts the meaning of "make."

of HEW's determination of eligibility in (a)(2)(A). That (a)(2)(A) refers to payment of interim benefits until an operator is identified and contests the claim is consistent with "initial determination of eligibility" as it appears in § 424(a)(1)(A), 30 U.S.C. § 934(a)(1)(A).[8] The employers argue that HEW's determination of eligibility is "initial" because a claimant can appeal the scope or terms of benefits under (a)(2)(B)(ii), not because the Secretary of Labor is to identify an operator who can then challenge the award. But the employers' interpretation does not resolve the dilemma, because, if a claimant appeals the scope of an award, the claim becomes subject to operator challenge under (a)(3)(A). In effect, the employers argue that Congress made HEW's determination of eligibility "binding" on the Secretary of Labor to protect Part B claimants from operator challenge, but allowed dissatisfied claimants to dispute the scope of the award only at the risk of losing the entire award through operator challenge. We doubt Congress intended such a curious result.

The most compelling reason for adopting the Director's interpretation of § 435, however, simply is that it reflects Congressional intent. The employers argue that if Congress had intended to make Part B claims subject to Part C payment procedures, Congress would have expressed such a dramatic change in structure clearly on the face of the statute.[9] Even if we accept that the statute itself does not clearly state such a change in the structure of the 1972 Act, the legislative history does. In the debate preceding the passage of the Reform Act, Sen. Jennings Randolph summarized review procedures for previously denied Part B claims:

> All denied Part B claimants will be given the option of having their claims reviewed based on existing files by the Secretary of HEW or transferred to the Secretary of Labor for review. In the latter case, the Secretary of Labor will treat the claim like a reviewed part C claim. If the HEW Secretary reviews the claim and it is found not approvable, the claimant will have the opportunity to have his or her claim transferred to the Department of Labor for further review based on any additional evidence that the claimant may submit. If the HEW Secretary approves the claim, it is transferred to the Department of Labor for payment as an initial determination of eligibility. *The Labor Secretary will immediately direct that payments be made from the trust fund or by a responsible operator if a responsible operator is identified.* Any responsible operator will have the right to litigate his responsibility and the eligibility of the claimant. If the operator prevails in such litigation, payments to the claimant will cease.

124 Cong.Rec.S. 1443 (daily ed. Feb. 7, 1978) (remarks of Sen. Randolph); *reprinted in* [The Legislative History of the] Black Lung Benefits Reform Act and the Black Lung Benefits Revenue Act of 1977, House Committee on Education and Labor, 96th Cong., February 1979, at 902 (emphasis added).

Sen. Jacob Javits also described the review procedures:

> *Coal mine operators,* through the tax revenues to the new trust fund and *through liability for individual claims, will be responsible for financing the cost of* all benefits, including *claims certified by the* Secretary of HEW under the new Section 435 of the Act.

124 Cong.Rec.S. 1446 (daily ed. Feb. 7, 1978) (remarks of Sen. Javits), *reprinted in The Legislative History, supra,* at 908 (emphasis added).

---

**8.** Section 424(a)(1)(A) concerns review of Part C claims. The section directs the Secretary of Labor to authorize payment of benefits from the trust fund where a responsible operator has been identified, but has not begun payments within 30 days after the Secretary's "initial determination of eligibility." Certainly the Secretary's determination is "initial" because the responsible operator can contest the claim in subsequent proceedings.

**9.** The argument, of course, inherently suffers from incompleteness or inconsistency. Part B claims, where the Secretary of Labor initially or upon review of a HEW denial approves them, are unquestionably subject to Part C payment procedures.

The employers argue that the individual views of Congressmen are entitled to limited weight as expressions of legislative intent, but the same point appears twice in the Conference Report, itself:

All reviews or refiled claims shall receive expedited treatment. The conferees also expect the Secretaries of HEW and Labor to establish a satisfactory mechanism to coordinate their responsibilities and to avoid both agencies simultaneously reviewing the claim of any claimant previously denied under part B and later denied, pending, or entitled under part C. The conferees expect the Secretary of HEW to administer the "interim" standards with a view to the just accomplishment of the purpose of allowing for reviewed part B claims to establish disability within the meaning of the 1977 amendments as they apply to all reviewed part B claims.

*For purposes of payment of benefits, all claims under review shall be treated as part C claims and shall be subject to relevant part C provisions which require payment of benefits by a coal mine operator, other employers, or by the trust fund established by the Black Lung Benefits Revenue Act of 1977.*

H.Conf.Rep.No. 864, 95th Cong., 2d Sess. 21–22, *reprinted in* [1978] U.S.Code Cong. & Ad.News 308, 315 (emphasis added). One page later the Conference Report states:

The conference substitute conforms to the Senate amendment in the respect that the Secretary of Labor is a party in any part C proceeding and in retaining the authority of current law for *operators to participate in the adjudication of claims for which they may be individually found liable (including part B claims certified or otherwise referred to the Secretary of Labor by the Secretary of HEW pursuant to the conference substitute).* *Id.* at 23 (Emphasis added).[10]

Finally, a bill was introduced in the House of Representatives in 1980 which would have amended the 1977 Reform Act to make the trust fund responsible for all reviewed Part B claims.[11] In the debate over H.R. 7745 several Congressmen expressed an understanding that the 1977 Reform Act made operators responsible for all Part B claims, including claims approved by HEW.[12] Although statements of legislative intent made subsequent to enactment are not nearly as authoritative as statements contemporaneous to enactment, they are entitled to some weight as secondary expressions of expert opinion. *See Copeland v. Martinez,* 603 F.2d 981, 988 (D.C.Cir. 1979). We think the subsequent statements interpreting the 1977 Reform Act deserve particular attention here, because the statements are not elsewhere in the legislative history for the time period in which they were made contradicted, and are consistent

10. The employers argue that Sen. Javits' comments are consistent with their interpretation of § 435; they read the comments to say simply that coal mine operators, either through the trust fund or through liability for individual claims, will be *responsible for payment of black lung benefits.* The fact that Sen. Javits made special reference to "claims *certified* by the Secretary of HEW," suggests that he understood that coal mine operators would be responsible for the claims where the operator is identified, and the trust fund would be responsible where no operator is identified. In any event, neither the comments of Sen. Randolph nor the excerpt from the Conference Report present a similar ambiguity. The statements can only be read to make individual coal mine operators liable for claims approved by HEW.

11. H.R. 7745 would have amended § 422(c) of the Black Lung Benefits Act, 30 U.S.C.

§ 932(c), to make individual operators liable only for claims arising out of employment after Dec. 31, 1973; in effect, operators would be liable only for true Part C claims.

12. For example, Congressman Perkins stated:

The 1977 amendments also required that all claims which had been previously denied or which were then pending be subject to review under the revised eligibility criteria prescribed by the new law.

All claims approved pursuant to review were to be paid either by a responsible coal operator or by the trust fund, without regard to whether they had been filed initially under part B, Federal liability, or part C, coal operator liability, of the black lung program. Part B claims were those filed prior to July 1, 1973.

126 Cong.Rec.H. 11409 (daily ed. Dec. 1, 1980).

with all contemporary (1977) statements. It is also pertinent that they were made in reference to a bill that would have amended the 1977 Act on the very point that is the subject of this litigation. When the statements are considered with the earlier statements of Senators Randolph and Javits, and the statements in the Conference Report, a strong expression of legislative intent emerges.

The interpretation of § 435 in *Yacubco* rests essentially on an argument of fairness. The Benefits Review Board concluded that it would be unfair to claimants whose claims were pending when the 1977 Reform Act was enacted to interpret § 435 to subject the claims to operator challenge. If the claims had been reviewed and approved before enactment, the claims immediately would have been paid from general Treasury revenues without operator challenge. Claimant Slevin makes a similar argument here with regard to claimants whose claims originally were denied. Presumably claims approved by HEW under § 435 originally were denied because they were judged by too restrictive criteria. Had the proper criteria been applied, the claims would have been approved and paid from general Treasury revenues without operator challenge. Slevin argues that it is unfair to subject the claimants (and the employers as well) to the cost and delay of another proceeding where eligibility can be challenged, simply because an administrator misapplied the proper criteria.

Although those arguments are not without force, other considerations make them less than compelling. First, relatively few claimants are subject to any alleged unfairness. Responsible operators are identified only in a minority of approved claims. And, assuming HEW applies the eligibility criteria correctly, the majority of contested claims will withstand operator challenge. But nothing is inherently unfair about a situation in which HEW approves a claim, and an operator later proves the claim meritless. The 1977 Reform Act does nothing more than liberalize the eligibility requirements for benefits and require a claimant to prove eligibility. If the claim is without merit, the claimant should not receive benefits. Such would be the case for any Part B claim approved by the Secretary of Labor but reversed in controversion proceedings. There is no reason why the claim should be any more immune from review and from ultimate denial if unjustified because it was approved by the Secretary of HEW instead of the Secretary of Labor.

Second, the employers seem to suggest that, because the coal industry bears the burden of black lung benefits through the trust fund, the government has no strong interest in the resolution of the issue. But the government may have a strong interest in ensuring that an individual coal mine operator pay benefits where the operator can be identified. In the debate over H.R. 7745, Rep. Rostenkowski stated that the trust fund was expected to have a deficit of $672 million by fiscal 1981, and $9.2 billion by 1995. Rostenkowski estimated that shifting liability from individual operators to the trust fund could add $1.8 billion to the deficit by 1995. *See* 126 Cong.Rec.H. 11410 (daily ed. Dec. 1, 1980).

We perceive no intent of Congress to create contradictory results depending solely on whether the Secretary of Labor or the Secretary of HEW initially approved a claim. Congress evidently wanted the law applied evenhandedly, whichever administrative route was pursued, with all entitled receiving benefits, and none not entitled doing so. The argument of the coal mine operators, in the end, comes to no more than a contention of *expressio unius est exclusio alterius*. If categories (2) and (3) were mentioned in (a)(3)(A), then, they say, category (1), not being mentioned, should be excluded. The maxim is to be applied with great caution and is recognized as unreliable. *Bruce v. Lumbermens Mutual Casualty Co.*, 222 F.2d 642, 645 (4th Cir. 1955); *National Petroleum Refiners Assoc. v. Federal Trade Commission*, 482 F.2d 672, 676 (D.C.Cir.1973); *Potomac Passengers Assoc. v. Chesapeake & Ohio Railway Co.*, 475 F.2d 325, 331 (D.C.Cir.1973); 2A Sutherland, *Statutory Construction*, § 47.25 at 132.

We are particularly reluctant to hold that the trust fund is solely responsible for claims approved by HEW where Congress has considered, but has yet to adopt, legislation that would have a similar effect. Therefore, because the Director's position is consistent with the language and structure of § 435, and because it finds ample support in the legislative history, we hold that individual coal mine operators are to be responsible for Part B claims approved by HEW. The four consolidated decisions of the Benefits Review Board are reversed, and remanded for proceedings consistent with this opinion.[13]

13. Following preparation of the foregoing opinion, but while it was still in circulation in the Court, two other circuits decided the same issue. The Seventh Circuit in *Director, Office of Workers' Compensation Programs, United States Department of Labor v. Forsyth Energy, Inc., et al.*, 666 F.2d 1104, decided December 11, 1981, reached the same conclusion.

The Third Circuit in *Director, Office of Workers' Compensation Programs, United States Department of Labor v. Republic Steel Corp. and Yakubco, et al.*, 663 F.2d 8, 10 (3d Cir. 1981), on October 23, 1981, came down 2–1 for the opposite result. The per curiam majority contented itself with simply stating:

We have examined the decisions of the Board and find no error in the Board's interpretation of the statute. Therefore, for the reasons set forth by the Benefits Review Board in *Yakubco*, the petition for review will be denied.

In dissenting, Judge Sloviter wrote at length and to us convincingly why the position of the Director was correct.