**UNITED STATES of America, Appellee,**

v.

**COUNTY OF ARLINGTON, VIRGINIA, Appellant,**

and

**Bennie L. Fletcher, Jr., Defendant.**

No. 82–1389.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 7, 1982.

Decided March 17, 1983.

---

Charles G. Flinn, Arlington County Atty., Arlington, Va. (David R. Lasso, Asst. Coun-ty Atty., Arlington, Va., on brief), for appellant.

John J. McCarthy, Tax Div., Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Washington, D.C., Elsie L. Munsell, U.S. Atty., Alexandria, Va., Michael L. Paup, David English Carmack, Tax Div., Dept. of Justice, Washington, D.C., on brief), for appellee.

Before MURNAGHAN and SPROUSE, Circuit Judges, and BUTZNER, Senior Circuit Judge.

MURNAGHAN, Circuit Judge:

Arlington County, Virginia sought to impose real property taxes on a multi-unit apartment building owned by the German Democratic Republic (GDR)[1] and used exclusively to house personnel and their families attached to its Embassy as members of its diplomatic mission to the United States.[2] In an earlier decision, *United States v. Arlington,* 669 F.2d 925 (4th Cir.1982), *appeal dismissed and cert. denied,* —— U.S. ——, 103 S.Ct. 23, 74 L.Ed.2d 39 (1982), we concluded that, for the period from and after May 4, 1979, the premises were exempt. We remanded for further proceedings so that the question might be addressed of the status for tax purposes of the premises owned by the GDR during the period prior to May 4, 1979 and reaching back to the time of purchase of the premises in 1976. The possibility of differing treatment, as between the two time frames, grew out of the fact that the GDR and the United States had entered an agreement on May 4, 1979 providing for reciprocal exemption from real estate taxes of property exclusively used for purposes of their respective diplomatic missions.[3] In remanding the

---

1. On September 4, 1974, the United States and the GDR entered into an agreement which established bilateral diplomatic relations. TIAS 7937, 25 U.S.T. 2597.

2. The GDR acquired the premises on July 28, 1976.

3. The agreement was prompted by a change in the views of the Department of State, leading it, upon further consideration, to the conclusion that the property was not taxable. *See* 669 F.2d at 928. The May 4, 1979 agreement, while conforming to a position adopted by the State Department prior to negotiation of and entry into that agreement, is not explicit as to whether or not it is intended to apply to any period prior to its effective date. It merely identifies its effective date as May 4, 1979. Whatever was intended in that regard, the question is to be resolved on the basis of what the law in fact was.

pre-May 4, 1979 issue for further consideration on the merits, we reversed a holding by the district court that, for the period prior to May 4, 1979, the United States was collaterally estopped from contending that the premises were exempt from taxation.

The agreement of May 4, 1979 conformed to and merely formalized implementation of existing diplomatic understandings. The United States has asserted on behalf of the GDR, and accepts as correct the proposition that the 1979 agreement merely codified the existing domestic and international law.

The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602, et seq., in § 1609 renders the property immune from attachment, arrest and execution, subject to the proviso, made through reference to § 1610, that the property not be "used for a commercial activity in the United States." The Vienna Convention on Diplomatic Relations of 1961, TIAS 7502, 23 U.S.T. 3227 in Article 23 exempts the guest nation and the head of the mission "from all national, regional or municipal dues and taxes in respect to the premises of the mission ... other than such as represent payment for specific services rendered." The "premises of the mission" are defined in Article 1(i) as the buildings and lands "used for the purposes of the mission including the residence of the head of the mission." The 1923 Treaty of Friendship, Commerce and Consular Rights between the United States and Germany, 44 Stat. 2132, T.S. No. 725,[4] exempts land and buildings of one party located in the territory of the other which are used for governmental purposes "from taxation of every kind, National, State, Provincial and Municipal, other than assessments levied for services or local public improve-

ments by which the premises are benefited."

The potentials for imaginative interpretation which would exclude the GDR staff housing premises from the benefits of tax exemption are numerous. Immunity from attachment, arrest and execution it may be argued concerns only limitations on *collection,* not on *imposition,* of the tax. Furthermore, provision of "free" housing for employees, affecting the quantum of salary, may be considered "commercial activity." The purposes of the mission should not be interpreted to extend to the maintenance of housing for the staff in general and their families. Otherwise the reference to "the residence of the head of the mission" is superfluous. *Expressio unius est exclusio alterius.* Real estate taxes, viewed from one perspective are for services (*e.g.,* trash collection) or local public improvements (*e.g.,* roads) benefiting the premises. The language of the May 4, 1979 agreement creating "exemption from real estate taxes for property, owned now or in the future," when coupled with an effective date of May 4, 1979, certainly is susceptible of interpretation as not applying to prior periods.

■ The United States candidly concedes that the provisions of the 1961 Vienna Convention are ambiguous with respect to the tax immunity of the property in question. We do not hesitate to extend that epithet to the other relevant language of treaty, statute and agreement as well. The Department of State has brought the diplomatic art of imprecision to a high level. Nevertheless, in the end we reach the conclusion that the view now advocated by the Government, and especially by the Department of State, should prevail.[5] The De-

---

4. The continued vitality of the 1923 agreement was assumed in *Zschernig v. Miller,* 389 U.S. 429, 432, 88 S.Ct. 664, 666, 19 L.Ed.2d 683 (1968) and especially in the concurring opinion of Justice Harlan. *See* 389 U.S. at 447, 449, 462, 88 S.Ct. at 674, 675, 681. *Cf. Clark v. Allen,* 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947).

5. *See Factor v. Laubenheimer,* 290 U.S. 276, 295, 54 S.Ct. 191, 196, 78 L.Ed. 315 (1933):

And in resolving doubts the construction of a treaty by the political department of the government, while not conclusive upon courts called upon to construe it, is nevertheless of weight.

It should be observed that the question here presented is one of general attitude or "common law" of the community of nations which affects interpretation of a relevant treaty or treaties. Hence arguments by Arlington County contending that earlier treaties, to the extent their language favors the present view of the

partment of State persuasively argues that its current position coincides with the generally accepted principle of customary international law. Maintenance of friendly relations with foreign powers transcends in importance municipal taxation. The County must yield in the interests of us all, itself included, to a course of favorable treatment, the purpose, and probable end effect, of which is to improve international relations, with East Germany, and possibly with other nations similarly circumstanced.

Thus, the position taken by Richard D. Kearney, Acting Legal Adviser of the United States Department of State, in a letter to the Comptroller of New York City of September 2, 1965, should prevail:

> The Department of State is of the opinion that under recognized principles of international law and comity the several states of the United States, as well as their political subdivisions, should not assess taxes against foreign government-owned property used for public non-commercial purposes.[6]

There are interpretations calling for tax-exemption at least as tenable as those to the contrary. Consequently, we regard the position adopted by the Department of State in an area of particular sensitivity and importance to the responsibilities conferred on it as the weight which tips the scales.

The attachment, arrest and execution immunity, although it may not, of itself, confer tax exemption, clearly looks in that direction, and, therefore, the Foreign Sovereign Immunities Act of 1976 contains nothing which would lead to a denial of exemp-

tion. The definition of "commercial" proposed by Arlington County calls for selection of the broadest possible meaning. Our role in construing statutes customarily involves decision as to where, on the spectrum of possible meaning to be assigned to a word, the legislature intended to come down. For the embassy of a foreign sovereign to provide housing for its staff members and their families simply is devoid of profit motive in any ordinary sense. Many considerations, unrelated to salary determination, come to mind as to why an embassy might prefer the greater accessibility and concentration of attention on mission matters of its personnel afforded by a single integrated housing arrangement in preference to wide scattering of employees throughout the Washington, D.C. area, including the Maryland and Virginia suburbs. So a less broad significance to the word "commercial" is indicated than the one proposed by Arlington County.

While the residence of the head of mission is specifically mentioned as a mission purpose, there is no language compelling a conclusion that living quarters of other mission staff, are not also a mission purpose. Residential premises occupied by an ambassador, single family in nature, and frequently devoted to entertainment and other personal niceties, on a scale and frequency not to be expected in the cases of lower echelon mission members, serve sufficiently distinct purposes that the parallelism which must underlie any application of the maxim, *expressio unius est exclusio alterius*[7] simply is not present.[8]

---

State Department, should be ignored on the ground that they have been repealed by adoption of later treaties are wide of the mark. The Department of State is acknowledging an improved perception of what it now believes to have been a consistent long range international attitude. It is not the applicable rule, but rather our Government's understanding, which has changed.

**6.** We need not extend ourselves to the extreme limits of hyperbole indulged in by counsel for the United States in the Complaint. Counsel sought to raise the spectre that "the power to tax such property" is "a power to destroy relations between the United States and foreign

governments." *Cf. McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 431, 4 L.Ed. 579 (1819).

**7.** *See Director, Office of Workers' Compensation Programs, United States Department of Labor v. Bethlehem Mines Corp.,* 669 F.2d 187, 197 (4th Cir.1982), as to the restricted applicability of the *expressio unius est exclusio alterius* approach.

**8.** That conclusion is reinforced by *Factor v. Laubenheimer,* 290 U.S. 276, 293–94, 54 S.Ct. 191, 195–96, 73 L.Ed. 315 (1933):

> In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not

Although, pursued far enough, the taxes here contested might be discovered in part to fund road building or repair and trash collecting, they doubtless would also be found to finance multiple other aspects of county government not susceptible of description, except in the most general way, as benefiting the premises. At least as probably, that limitation on the tax exemption conferred by the 1923 Treaty of Friendship, Commerce and Consular Rights was directed at front foot benefit assessments and the like, specifically limited to the very premises. Finally, the May 4, 1979 agreement may readily be construed as imposing no time limitation on *exemption,* the "now or in the future" language modifying not "exemption" but rather "property owned." [9]

> consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. For that reason if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred.

**9.** In thus deciding in favor of the position maintained by the United States, we nevertheless feel some sympathy for Arlington County. For several years ago, until indeed the State Department changed its mind, at or about the time it negotiated the May 4, 1979 agreement, it also regarded premises such as those at the center of the instant litigation as taxable. *See* letter of November 6, 1980 from the State Department to the Department of Justice, written in the context of the present case where it is stated:

> However, in the absence of an express treaty exemption the United States has not heretofore sought to compel the observance of tax exemption for foreign-government-owned real property used for housing the staff of an official mission. . . .
>
> It has become increasingly clear, however, that the United States is extremely isolated in its failure to ensure uniformly the tax exempt status of diplomatic property used for official residential purposes. We have now concluded that State practice under the 1961 Vienna

Having disposed of the substantial issue presented by determining that the tax exemption prevailed from July 28, 1976 to May 4, 1979, we now turn to procedural irregularities about which Arlington County complains.

■ For reasons also related to the nature of the case as one involving the relationship between the United States of America and a foreign power, we find that the district judge acted well within his discretion in accepting, although the "personal knowledge" and "competence to testify" rubrics of Fed.R.Civ.P. 56(e) were omitted, a letter from Dr. Horst Grunert, the GDR ambassador to the United States,[10] dated March 18, 1982, affirming that the property, since its purchase by the GDR embassy

> Convention on Diplomatic Relations, . . . has become so firmly and uniformly established in exempting such property that the continued refusal to ensure comparable treatment in the United States would violate international law.

Arlington County understandably is uncomfortable about the possibility that the State Department may flip-flop again, and the County may be presumed to dislike the idea of the Federal Government supplanting the local taxing authorities. However, nothing suggests arbitrariness other than that "arbitrariness" inherent in any change of position. This is not a case in which the County seeks just compensation from the United States for the taking of the right to tax the GDR premises (we do not intimate, in any way, that such a right to indemnification or reimbursement does or does not exist). On the contrary, it presents an orderly exercise by the Department of State of powers conferred upon it, and the consequences must be accepted by Arlington County.

**10.** Arlington County complains that the identity of the author of the letter is not stated. As to the identity of the holder of that high office, we, if need be, take judicial notice that, on March 18, 1982, Dr. Grunert was the ambassador. However, the letter is on the stationery of "The Ambassador Extraordinary and Plenipotentiary of the German Democratic Republic." Dr. Grunert signed in no other capacity. Fairly read, the letter contains an asseveration that Dr. Grunert was the Ambassador when he signed.

**490**

in 1976, had been used solely to house embassy staff and families, without any charge to the occupants of rent. The letter declared that it was true under penalty of perjury, which conferred upon it the status of an affidavit. *See* 28 U.S.C. § 1746. Given the nature of the office, Dr. Grunert's responsibility to know the facts set forth in the letter of March 18, 1982, and judicial, as well as diplomatic, reluctance to conclude, in the absence of any evidence, that he was not competent to testify, we find sufficient practical compliance with Fed.R.Civ.P. 56(e). State Department practice regularly accepts without challenge representations of foreign governments as to the actual use of property in question without conducting a further examination. There are acceptable diplomatic considerations for that practice, which avoids deterioration of bilateral relations with other countries.

The Department of State additionally submitted to the district court, in response to an interrogatory filed by Arlington County, a list of all residents of the property, giving their positions at the GDR embassy through the period from 1976 through 1979. None of the information contained in the list has been contradicted by the County. Thus, the evidence relied on by Judge Butzner in his earlier determination in *United States v. Arlington,* 669 F.2d 925 (4th Cir.1982), *appeal dismissed and cert. denied,* —— U.S. ——, 103 S.Ct. 23, 74 L.Ed.2d 39 (1982), has been amply supplemented for the period prior to May 4, 1979.

The argument of Arlington County that interrogatories were not properly responded to is simply frivolous. The Government has satisfactorily explained that it has provided all information in its possession and accessible to it, given the accepted protocol in force between sovereign governments respecting tax treatment of one sovereign in the country of the other.

Accordingly, the summary judgment granted by the district court holding the property exempt from taxation for the period prior to May 4, 1979 is

AFFIRMED.