08-1805-cv; 08-1806-cv
City of New York v. The Permanent Mission of India to the United Nations; City of New York v. The Bayaryn Jargalsaikhan

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2009

(Argued:    March 10, 2010                    Decided:    August 17, 2010)

Docket Nos. 08-1805-cv, 08-1806-cv
(consolidated for disposition)

_____

THE CITY OF NEW YORK,

*Plaintiff-Appellee*,

– v. –

THE PERMANENT MISSION OF INDIA TO THE UNITED NATIONS,

*Defendant-Appellant*,

Great America Leasing Corporation, Jane Doe #1 through Jane Doe # 20, the names of the last 20 defendants being unknown to the plaintiff, the persons or parties intended to be, persons or corporations, if any, having or claiming an interest in or lien upon the property described in the complaint,

*Defendants*.

_____

THE CITY OF NEW YORK,

*Plaintiff-Appellee*,

– v. –

THE BAYARYN JARGALSAIKHAN, as principal resident representative to the United Nations of the Mongolian People's Republic,

1

*Defendant-Appellant.*

---

Before: CALABRESI, HALL, *Circuit Judges*, SESSIONS,[1] District Judge.

Appeal from an opinion and order of the United States District Court for the Southern District of New York (Rakoff, *J.*) granting summary judgment to the Plaintiff the City of New York. The District Court held that property owned by the governments of India and Mongolia that is used to house mission and consular staff was subject to property taxation under international and state law. While this appeal was pending, the United States Department of State issued a Notice pursuant to the Foreign Missions Act, 22 U.S.C. § 4301 et seq., designating as a "benefit" under the Act an exemption from real property taxes on property owned by foreign governments and used to house the staff of permanent missions to the United Nations or the Organization of American States or of consular posts. The Notice states that the benefit determination preempts all inconsistent state and local laws, and also applies to all property taxes that "have been or will be assessed," on such property. We hold that the Notice issued by the Department of State was a lawful exercise of the Department's authority under the Foreign Missions Act, and that the Notice operates in this case to render Appellants exempt from the property taxes imposed by the City, and so nullifies the City's existing tax liens against Appellants. Accordingly, we **VACATE** the opinion of the District Court, **REVERSE** the judgment of the District Court, and **REMAND**.

---

MICHAEL A. CARDOZO, Corporation Counsel of the City of New York (John Low-Beer, Scott Shorr, Sarah Stewart, *of counsel*), *for Plaintiff-Appellee*.

AARON STIEFEL, Robert A. Kandel, Marisa Pizzolato, KAYE SCHOLER LLP, New York, N.Y., David O. Bickart, KAYE SCHOLER LLP, Washington, D.C., *for Defendants-Appellants*.

H. THOMAS BYRON III, Attorney, United States Department of Justice, Civil Division, Appellate Staff, Washington D.C. (Harold Hongju Koh, Legal Adviser, United States Department of State, James H. Thessin, Deputy Legal Adviser, United States Department of State, Susan Benda, Attorney Adviser, United States Department of State, Tony West, Assistant Attorney General, Lev. L. Dassin, Acting United States Attorney, David S. Jones,

---

[1] The Honorable William K. Sessions III, Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

Assistant United States Attorney, Douglas Letter, Attorney, United States Department of Justice, Civil Division, Appellate Staff, *on the briefs*), *for Amicus Curiae United States of America*.

_____

CALABRESI, *Circuit Judge*:

These consolidated appeals arise from a long-standing tax dispute between the City of New York ("the City") and certain foreign sovereigns who operate missions to the United Nations in the City. For years, the City has assessed property taxes against these missions, maintaining that while those parts of embassy buildings that are used for diplomatic offices are exempt from property taxation under international and state law, other parts of the buildings—those that are used as residences for employees and their families—are not exempt. Appellants, the Permanent Mission of India to the United Nations (the "India Mission") and the Principal Resident Representative of the Mongolian People's Republic to the United Nations (the "Mongolia Mission")—collectively "the Missions"—have resisted paying any property taxes to the City. They contend that their entire embassy buildings are tax exempt.

This dispute, and the litigation it engendered, ultimately prompted the United States Department of State ("Department of State" or "State Department") to act. In June 2009, the State Department issued a notice pursuant to its authority under the Foreign Missions Act, 22 U.S.C. § 4301 et seq., establishing an exemption from real property taxes on property owned by foreign governments and used to house the staff of permanent missions to the United Nations or the Organization of American States or of consular posts. *See Designation and Determination under the Foreign Missions Act* (the "State Department Notice" or the "Notice"), 74 Fed. Reg. 31,788 (July 2, 2009). The Notice stated that this exemption would preempt inconsistent State

and local laws and also that it would apply retroactively to taxes that had been previously assessed against the designated property. *Id.* We are now called upon to determine whether the action taken by the State Department was within its statutory authority. We conclude that it was. Specifically, we hold that the Foreign Missions Act ("FMA") permits the State Department to designate affirmative benefits such as tax exemptions and that the Act allows the State Department to make such tax exemptions preemptive of State and municipal tax laws. We also hold that, under the circumstances of this case, the State Department acted within its power in designating this benefit as effective retroactively. Finally, we conclude that the Notice issued by the State Department was procedurally proper because it falls within the "foreign affairs function" exception to notice and comment under the Administrative Procedure Act, 5 U.S.C § 553(a)(1).

## BACKGROUND

### I.

The India Mission is housed in a twenty-six story building, located at 235 East 43rd Street, New York, N.Y., and owned by the government of the Republic of India. The first six floors of the building, as well as the basement and the cellar, are used for diplomatic offices. The remaining floors are dedicated to rent-free residential space for security personnel, a driver, and the diplomats of the Mission and of India's consulate in New York (the offices of which are located elsewhere in the City). All of these employees rank below the head of the Mission, whose residence is not on site. The Mongolian Mission is housed in a multi-story building at 6 East 77th Street in New York City that is owned by the People's Republic of Mongolia. The first two floors are used for the Mission's offices. The third floor is used for the Ambassador's

4

apartment. The top two floors are used as rent-free apartments for other employees of the Mission.

The City has consistently taken the position that mission property used for the residences of lower-level employees is subject to taxation, and it has been levying taxes on such properties for years. Both the India Mission and the Mongolia Mission have argued that these residences are exempt from taxation under international and New York law because the residences are used for the purposes of the mission/consulate. They have therefore refused to pay any property taxes to the City. By operation of New York law, the unpaid taxes converted into tax liens held by the City against the relevant properties.

## II.

### A.

In April 2003, the City filed separate complaints against several foreign missions in New York state court.[2] Pursuant to 28 U.S.C. § 1441(d), the Missions removed the cases to the United States District Court for the Southern District of New York. In its amended complaints, the City sought judgments for unpaid property taxes (and other unpaid charges) plus interest. The City also sought declaratory judgments to establish the validity of its tax liens against these missions. After limited jurisdictional discovery, the India Mission and the Mongolia Mission

---

[2] In addition to bringing suit against Appellants, the City sued the Republic of Turkey ("Turkey") and the Republic of the Philippines ("the Philippines"). Turkey subsequently settled with the City for $6 million. *See City of N.Y. v. Permanent Mission of India to the U.N.*, 446 F.3d 365, 367 n.2 (2d Cir. 2006). The suit against the Philippines was consolidated with the suits against the India Mission and the Mongolia Mission. The District Court found that parts of the building owned by the Philippines were taxable, but that others were not. The parties initially filed an appeal and cross-appeal respectively, but those appeals were withdrawn with prejudice after the parties reached a settlement in January 2009. *See* Sewell Chan, *Philippines to Pay $ 9 Million in Property Taxes and Interest*, N.Y. Times, Jan. 30, 2009, at A24.

Because these missions are not parties to this appeal, all subsequent references to "the Missions" refer exclusively to the India Mission and the Mongolia Mission.

moved to dismiss, contending that, pursuant to the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. § 1604, the District Court lacked subject matter jurisdiction. The District Court denied the motion. It concluded that under the FSIA's "immovable-property" exception—which provides that "[a] foreign state shall not be immune from jurisdiction . . . in any case . . . in which rights in . . . immovable property situated in the United States are in issue," 28 U.S.C. § 1605(a)(4)—the court had jurisdiction to adjudicate the validity of the City's tax liens. *See City of N.Y. v. Permanent Mission of India to the U.N.* ("*Permanent Mission I*"), 376 F. Supp. 2d 429, 439 (S.D.N.Y. 2005).

The Missions filed an interlocutory appeal that was limited exclusively to the jurisdictional issue. We affirmed the judgment of the District Court, holding that the immovable property exception to foreign sovereign immunity provided jurisdiction over the matter because what was in dispute was "the extent of defendants' obligations under local law (here, property taxes) arising directly out of ownership of real property in the United States." *See City of N. Y. v. Permanent Mission of India to the U.N.*, 446 F.3d 365, 376 (2d Cir. 2006). The Supreme Court granted certiorari, 549 U.S. 1177, and affirmed. *Permanent Mission of India to the U.N. v. City of N.Y.*, 551 U.S. 193 (2007).

B.

The cases were then remanded to the District Court for proceedings on the merits. The parties cross-moved for summary judgment on the question of whether the parts of the properties used by India and Mongolia to house their staff were subject to real estate taxation. The District Court held that they were. *See City of N.Y. v. Permanent Mission of India to the U.N.* ("*Permanent Mission II*"), 533 F. Supp. 2d 457, 460 (S.D.N.Y. 2008).

6

The District Court first addressed the Missions' claimed tax exemption under the applicable Vienna Conventions: a) Article 32 of the Vienna Convention on Consular Relations, ("VCCR"), Apr. 24, 1963, 21 U.S.T. 77, (ratified 1969), for the portions of the premises that house consular staff and b) Article 23 of the Vienna Convention on Diplomatic Relations ("VCDR"), Apr. 18, 1961, 23 U.S.T. 3227, (ratified 1972), for the portions of the premises that house the U.N. Missions. Under the VCCR,

> [c]onsular premises and the residence of the career head of consular post of which the sending State or any person acting on its behalf is the owner or lessee shall be exempt from all national, regional or municipal dues and taxes whatsoever, other than such as represent payment for specific services rendered.

VCCR art. 32. "[C]onsular premises" are defined in the VCCR as "the buildings or parts of buildings and the land ancillary thereto . . . used exclusively for the purposes of the consular post." *Id.* art. 1(j). As the District Court explained, the VCDR "reaches the same result as the VCCR but through a slightly more circuitous route." *Permanent Mission II*, 533 F. Supp. 2d at 461. Article 1 of the VCDR defines "premises of the mission"[3] to comprise:

> the buildings or parts of buildings and the land ancillary thereto, irrespective of ownership, used for the purposes of the mission including the residence of the head of the mission.

VCDR art. 1(i). Article 23, in turn, provides:

> The sending State and the head of the mission shall be exempt from all national, regional or municipal dues and taxes in respect of the premises of the mission, whether owned or leased, other than such as represent payment for specific services rendered.

VCDR art. 23.

The District Court held that "the plain language of the VCCR and the VCDR unequivocally supports the City's position" that the portions of the missions used to house

---

[3] A "mission," in turn, "consists of a group of people sent by one state to another; it does not refer to the premises which they occupy in the receiving state." *United States v. Kostadinov*, 734 F.2d 905, 908 (2d Cir. 1984).

7

employees and their families are not tax exempt. *Permanent Mission II*, 533 F. Supp. 2d at 461. The Court reasoned that both the VCCR and VCDR limited tax exemptions to the actual office space of the consular or mission premises and to the residence of the head of the mission or consular post. The District Court observed that the VCCR "distinguishes for tax purposes between 'consular premises' and 'residence,'" which led the Court to conclude that the provision "limits the tax exemption respecting residence to 'the residence of the career head of consular post' and none other." *Id.* at 460-61. Similarly, with respect to the VCDR, the District Court found that the two provisions quoted above, "when taken together, make plain that the residential exemption from taxes is limited to 'residence of the head of the mission,' and not to others." *Id.* at 461.

The District Court then rejected the Missions' remaining arguments, including their contention that disputed portions of the missions were exempt from taxation under customary international law.[4] *See id.* at 461-62. Accordingly, the District Court granted the City's motion for summary judgment, thereby validating its tax liens and its assessment of taxes with interest against India and Mongolia. *See id.* at 470. The Court asked the parties to submit letters regarding the amounts due to the City. In a subsequent order, the District Court rejected all of the Missions' objections to the City's calculations, including their general objection that the interest rates imposed by the City were "exorbitant." *See City of N.Y. v. Permanent Mission of India to the U.N.* ("*Permanent Mission III*"), 538 F. Supp. 2d 701, 703 (S.D.N.Y. 2008).

---

[4] As to the Philippines, the District Court also considered and rejected the argument— now asserted on appeal by Appellants—that its property was tax exempt under section 418 of the New York Real Property Tax Law. *See Permanent Mission II*, 533 F. Supp. 2d at 466. This New York statute exempts from taxation real property owned by a foreign government that is "used exclusively for the purposes of maintaining offices or quarters" for that country's "principal resident representative" or for "offices for the staff of such representatives." N.Y. Real Prop. Tax Law § 418.

Judgment was therefore entered against the India Mission in the amount of $42,451,769.35 and against the Mongolia Mission in the amount of $4,395,003.13. *Id.* at 704.[5] Both the India Mission and the Mongolia Mission filed notices of appeal.

## III.

On June 23, 2009, while this appeal was pending, the Department of State issued a notice entitled *Designation and Determination under the Foreign Missions Act*, 74 Fed. Reg. 31,788. Invoking its authority under the FMA, the State Department "designate[d] [an] exemption from real property taxes on property owned by foreign governments and used to house staff of permanent missions to the United Nations or the Organization of American States or of consular posts as a *benefit* for purposes of the Foreign Missions Act." *Id.* (emphasis added). The Notice further explained that the exemption "shall be provided to such foreign missions on such terms and conditions as may be approved by the Office of Foreign Missions and that *any state or local laws to the contrary are hereby preempted*." *Id.* (emphasis added).

The Notice stated that the action taken was "in accord with the tax treatment of foreign government-owned property in the United States used as residences for staff of bilateral diplomatic missions and conforms to the general practice abroad of exempting government-owned property used for bilateral or multilateral diplomatic and consular mission housing." *Id.* (citation omitted). The State Department explained its action as follows:

> This action is necessary to facilitate relations between the United States and foreign states, to protect the interests of the United States, to allow for a more cost

---

[5] The India Mission was charged interest at a rate of 18% from the period beginning in 1991 to the entry of judgment in 2008. The Mongolia Mission was charged the same interest rate for this time-period. For taxes dating from 1980 to 1990, the interest rate varied from 15% to 25.5%.

On the consent of the parties, these amounts included interest calculated through February 25, 2008. All interest thereafter was to be calculated on basis of federal post-judgment rates. *See Permanent Mission III*, 538 F. Supp. 2d at 704.

effective approach to obtaining benefits for U.S. missions abroad, and to assist in resolving a dispute affecting U.S. interests and involving foreign governments which assert that international law requires the exemption from taxation of such diplomatic and consular properties. The dispute has become a major irritant in the United States' bilateral relations and threatens to cost the United States hundreds of millions of dollars in reciprocal taxation. As the largest foreign-government property owner overseas, the United States benefits financially much more than other countries from an international practice exempting staff residences from real property taxes, and it stands to lose the most if the practice is undermined. Responsive measures taken against the United States because of the dispute also have impeded significantly the State Department's ability to implement urgent and congressionally mandated security improvements to our Nation's diplomatic and consular facilities abroad, imposing unacceptable risks to the personnel working in those facilities. This action will allow the United States to press forward with improvements that will protect those who represent the Nation's interests abroad.

*Id.*

The State Department explicitly addressed the Notice's intended retroactive effect, asserting that the

exemption from real property taxes provided by this designation and determination shall apply to taxes that *have been* or will be assessed against any foreign government with respect to property subject to this determination, *and shall operate to nullify any existing tax liens with respect to such property*, but shall not operate to require refund of any taxes previously paid by any foreign government regarding such property.

*Id.* (emphasis added). Finally, the State Department indicated that the actions taken in the Notice

"are not exclusive and are independent of alternative legal grounds that support . . . tax

exemption." *Id.*

We granted the Government's motion to submit out of time an *amicus* brief formally

apprising the Court of the Notice and discussing its legal implications. We then gave the parties

an opportunity to respond, and allowed the Government to file a supplemental *amicus* brief to reply to the City's arguments.[6]

The two cases were argued together, and we have now consolidated them for disposition.

**DISCUSSION**

The State Department Notice squarely applies to the tax dispute at issue in this case. The Notice (1) provides that, as a benefit under the FMA, "property owned by foreign governments and used *to house staff* of permanent missions . . . or of consular posts" is exempt from real property taxation; (2) states that "any state or local laws to the contrary," such as those of New York City, are preempted; and (3) expressly states that the tax exemption is to apply retroactively to taxes that have previously been assessed and "shall operate to nullify any existing tax liens" with respect to the affected property. 74 Fed. Reg. 31,788 (emphasis added). Therefore, if the State Department's issuance of the Notice was procedurally proper, and if the actions taken in the Notice are within the Secretary's lawful authority under the FMA, then the Notice is dispositive of this case and requires that we find in favor of the Missions irrespective of whether the Missions are also entitled to immunity from taxation under either international or state law.

After outlining the relevant provisions of the FMA, we address the issue of whether the Notice establishing the tax exemption as a "benefit" is lawful as applied prospectively. We then consider whether it was within the State Department's authority to designate such a benefit to be effective retroactively. Finally, we address whether the Notice was procedurally proper, given that it was promulgated without notice and comment.

---

[6] The Government has not taken a position, either in its briefs or at oral argument, on any of the other legal issues raised by these appeals, including the proper interpretation of the VCCR and the VCDR.

11

**I.**

The FMA was enacted in 1982 to "support the secure and efficient operation of United States missions abroad, to facilitate the secure and efficient operation in the United States of foreign missions . . . , and to assist in obtaining appropriate benefits, privileges, and immunities for those missions and organizations and to require their observance of corresponding obligations in accordance with international law." 22 U.S.C. § 4301(b). The Act's legislative history indicates that Congress was troubled by the fact that "an increasing number of countries" denied United States missions suitable locations or long-term rights to property or facilities, resulting in increased costs and diminished security and effectiveness. *See* S. Rep. No. 97-283, at 2 (1981). The Act was designed to address this "serious and growing imbalance between the treatment accorded in many countries to official missions of the United States [] and that made available to foreign government missions in the United States." *Id.* at 1. Congress sought to accomplish this by creating "a statutory scheme that vests broad discretion in the Secretary of State to exercise authority over foreign missions in light of [relevant] foreign policy considerations and concerns." *Republic of Benin v. Mezei*, 483 F. Supp. 2d 312, 320 (S.D.N.Y. 2007). To this end, the Act specifies that the "treatment to be accorded to a foreign mission in the United States shall be determined by the Secretary [of State] after due consideration of the benefits, privileges, and immunities provided to missions of the United States in the country or territory represented by that foreign mission . . . ." 22 U.S.C. § 4301(c).

The term "benefit"—whose meaning is central to the State Department's Notice and the City's challenge to it—is defined under section 4302(a) to mean:

any acquisition, or authorization for an acquisition, in the United States by or for a foreign mission, including the acquisition of—(A) real property . . . , (B) public

12

services . . . , (C) supplies, maintenance, and transportation, (D) locally engaged staff . . . , (E) travel and related services, (F) protective services, and (G) financial and currency exchange services, and includes *such other benefits as the Secretary may designate*.

§ 4302(a)(1) (emphasis added). Section 4302(b) directs that determinations "with respect to the meaning and applicability" of terms listed in section 4302(a)—including "benefit"—are "committed to the discretion of the Secretary." The legislative history indicates that this provision was included to "avoid conflicting interpretations by different government agencies and courts and potential litigation that might detract from the efficient implementation of [the FMA] or might adversely affect the management of foreign affairs." S. Rep. No. 97-283, at 7 (1981).

Section 4303 specifies the functions to be carried out by the Secretary. They include, *inter alia*, "[a]ssist[ing] agencies of Federal, State, and municipal government with regard to ascertaining and according benefits, privileges, and immunities to which a foreign mission may be entitled,"[7] and "[p]rovid[ing] or assist[ing] in the provision of benefits for or on behalf of a foreign mission in accordance with section 4304 of [the Act]." 22 U.S.C. § 4303(1)-(2). Section 4304 governs the "[p]rovision of benefits." Pursuant to it, the Secretary may provide benefits, subject to any terms and conditions that she specifies, either "[u]pon the request of a foreign mission," § 4304(a), or when the Secretary "determines that such action is reasonably necessary on the basis of reciprocity or otherwise" to help meet certain foreign policy goals including:

(1) to facilitate relations between the United States and a sending State, (2) to protect the interests of the United States, (3) to adjust for costs and procedures of obtaining benefits for missions of the United States abroad, (4) to assist in resolving a dispute affecting United States interests and involving a foreign mission or sending State, or (5) . . . to implement an exchange of property

---

[7] "Privileges and immunities" refer to international law obligations the United States owes to foreign missions. Such obligations exist irrespective of the Secretary's "benefit" designations. *See* 22 U.S.C. § 4310.

13

between the Government of the United States and the government of a foreign country . . . .

*Id.* at § 4304(b)(1)-(5). If the Secretary determines that action is necessary, then she "may require a foreign mission (A) to obtain benefits from or through the Secretary on such terms and conditions as the Secretary may approve, or (B) to forego the acceptance, use, or relation of any benefit or to comply with such terms and conditions as the Secretary may determine . . . ." *Id.* at § 4304(b).

The FMA includes a section that addresses preemption. That section provides in full:

> Notwithstanding any other law, no act of any Federal agency shall be effective to confer or deny any benefit with respect to any foreign mission contrary to this chapter. Nothing in section 4302, 4303, 4304, or 4305 [addressing the property of foreign missions] of this title may be construed to preempt any State or municipal law or governmental authority *regarding zoning, land use, health, safety, or welfare,* except that a *denial* by the Secretary involving a benefit for a foreign mission within the jurisdiction of a particular State or local government shall be controlling.

*Id.* at § 4307 (emphasis added).

Section 4308 sets forth general provisions for the regulation of foreign missions. Relevant among them, section 4308(a) provides the Secretary with the authority to issue regulations to carry out the policy of the FMA, and section 4308(g) establishes that "[e]xcept as otherwise provided, any determination required under [the FMA] shall be committed to the discretion of the Secretary."

**II.**

A.

When Congress expressly confers to an agency interpretive authority over a statute that the agency is administering, our review of the agency's interpretation is limited and deferential. *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001); *McNamee v. Dep't of the*

14

*Treasury*, 488 F.3d 100, 105 (2d Cir. 2007). We give a policy determination made by an agency pursuant to its explicitly delegated authority "controlling weight unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 324 (1994) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)). Our deference is especially substantial with respect to the State Department's administration of its delegated responsibilities under the FMA because the Act deals with an area "bound up with security concerns and issues of reciprocity among nations." *Sheridan Kalorama Historical Ass'n v. Christopher*, 49 F.3d 750, 756 (D.C. Cir. 1995). We recognize that the State Department is best positioned a) to assess the impact laws and policies like the City's have on the effective functioning of foreign missions in the United States, and b) to consider the collateral consequences those laws and policies will have on the interests of the United States missions abroad.

Limited review does not, however, mean no review. Though the FMA vests interpretive discretion in the Secretary over certain terms like "benefit," it remains incumbent upon us as a court to determine whether the Notice exceeds the State Department's statutory authority. *See Schweiker v. Gray Panthers*, 453 U.S. 34, 44 (1981) (indicating that courts do "not abdicate review" in the context of an express delegation of substantive authority, but instead follow the limited task of ensuring that the Secretary did not exceed her delegated authority or issue a regulation that is arbitrary or capricious); *Palestine Info. Office v. Shultz*, 853 F.2d 932, 934 (D.C. Cir. 1988) (explaining that judicial review of executive action under the FMA is "confined to determining that the Secretary acted in conformity with the provisions of the [statute]").

B.

15

The first question we must answer, therefore, is whether the FMA authorizes the State Department to designate property tax exemptions for mission and consular staff residences as "benefits." The Government, whose position Appellants adopt, argues that the Notice falls within the expansive authority granted in the FMA to the State Department. The City argues that it does not, and contends that exemptions from generally applicable local laws, including tax laws, are not within the permissible scope of the statutory term "benefit." The City maintains that "benefit" is used in a technical, narrow, and somewhat counter-intuitive sense in the FMA. According to the City, the FMA authorizes the State Department to designate goods and services as benefits only for the purpose of imposing reciprocal *restrictions*, and not for the purpose of "award[ing] favors to foreign missions by relieving them of their local law obligations." Appellee Resp. Br. to Amicus Curiae 20. On this view, benefits are limited to acquisitions of existing real property, and other goods, and services that are readily available to the general public. The City argues that when the State Department designates such items as "benefits" for a foreign mission, the action serves as a potential sanction because the designation gives the State Department authority, under section 4304, to impose restrictions on otherwise freely-available items as a way to reciprocate for restrictions imposed on United States missions abroad. The City bases its argument on the text and structure of the FMA, as well as on the asserted broader purpose of the legislation, which according to the City is embodied both in the statute's legislative history and in the manner in which it has subsequently been implemented by the State Department.

1.

We begin our interpretation of a federal statute with the statutory text. *See United States v. Hasan*, 586 F.3d 161, 166 (2d Cir. 2009). Section 4302(a) defines "benefit" as follows: It

16

first provides that "benefit" means "any acquisition, or authorization for an acquisition," of a variety of thereafter enumerated goods and services. 22 U.S.C. § 4302(a)(1)(A)-(G). Then, in a phrase set-off from aforementioned list of examples, it states that "benefit" also "includes such other benefits as the Secretary may designate," *id.* § 4302(a)(1). The State Department relies on the second part of this definition for the authority to designate as a benefit the tax exemption for mission and consular residences.

We agree that the broad and open-ended language of the second part of this definition empowers the State Department to grant positive benefits, such as property tax exemptions. Nothing in 22 U.S.C. § 4302(a)(1) limits the category of "other benefits" in the second part of the definition to the enumerated list of "acquisition[s]" in the first-part. To the contrary, the illustrations used in the definition are explicitly non-exclusive, and the second part of the definition is best read as authorizing the State Department to designate additional benefits that are consistent with the FMA's general purposes. Such a delegation is unexceptional in a statute that confers discretionary authority to an executive department to manage foreign affairs. *See Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas."). And though this delegation is broad, it is not unguided. Section 4301(c), for instance, directs that the treatment of a foreign mission "shall be determined . . . after due consideration of the benefits, privileges, and immunities provided to missions of the United States in the country or territory represented by that foreign mission, as well as matters relating to the protection of the interests of the United States." In addition, section 4304 sets forth the grounds on which the Secretary should rely in deciding whether to provide benefits and whether to set terms and conditions on their use. Indeed, in the Notice, the State Department expressly

17

referenced the statutory objectives identified in sections 4301 and 4304 of the FMA as the basis for its benefit designation. *See* 74 Fed. Reg. 31,788 ("This action is necessary to facilitate relations between the United States and foreign states, to protect the interests of the United States, to allow for a more cost effective approach to obtaining benefits for U.S. missions abroad, and to assist in resolving a dispute affecting U.S. interests and involving foreign governments which assert that international law requires the exemption from taxation of such diplomatic and consular properties.").

In an attempt to resist this understanding of "benefit," the City invokes the principle of *ejusdem generis*. *Ejusdem generis* is a textual canon of statutory interpretation that instructs courts to interpret a general term in a statute that follows a list of more specific terms "to embrace only objects of the same kind or class as the specific ones." *United States v. Amato*, 540 F.3d 153, 160 (2d Cir. 2008). The City acknowledges, as it must, that the first part of the definition of "benefit" in section 4302(a)(1)(A)-(G) is illustrative rather than exhaustive, but it urges that the illustration serves to restrict the scope of the second part of the definition that gives the Secretary authority to designate "other benefits." According to the City, the common category established by the list in section 4302(a)(1)(A)-(G), consists of "acquisitions of existing real property, goods, and services" that are "readily available to the public for lawful acquisition." Appellee Resp. Br. to Amicus Curiae 27. This restriction of the general term "other benefits" to "items readily available to the public for lawful acquisition" fits with the City's view of the FMA as authorizing the State Department to designate benefits exclusively for the purpose of imposing sanctions by restricting access to generally-available items. It also necessarily would exclude tax exemptions from the permissible scope of the term because

18

exemptions, by definition, are not generally available to the public, and their recognition as a benefit is a favor to foreign missions, not a sanction.

We find the City's textual argument unconvincing. The principle of *ejusdem generis* is "no more than an aid to construction" that "comes into play only when there is some uncertainty as to the meaning of a particular clause in a statute." *See United States v. Turkette*, 452 U.S. 576, 581 (1981). It does not "warrant confining the operations of a statute within narrower limits than were intended." *United States v. Kennedy*, 233 F.3d 157, 161 n.4 (2d Cir. 2000) (internal quotation marks omitted). Adopting the City's argument would have precisely the effect of imposing limitations on statutory language that is purposefully broad. The dictionary definition of "benefit"—"something that . . . promotes well-being" or a "useful aid," *Webster's Third New International Dictionary of the English Language Unabridged* 204 (1992) —is much more expansive than the City's formulation. Statutory language, of course, "has meaning only in context," *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 130 S. Ct. 1396, 1404 (2010) (internal quotation marks omitted), and so it is possible that Congress may use a general word in a sense that is more technical and limited than its standard definition, *see E. Norman Peterson Marital Trust v. C.I.R.*, 78 F.3d 795, 796-97 (2d Cir. 1996). But there is no contextual basis for adopting a narrower than normal meaning here. And we are especially reluctant to use the principle of *ejusdem generis* to narrow the interpretation of "benefit" under the FMA. For doing so would risk reading judicial limits into a term Congress seems deliberately to have sought to leave open-ended in order to give the State Department flexibility in an area where flexibility is particularly desirable. To the extent that some uncertainty about the scope of the term benefit exists, we are, therefore, guided first and foremost by the FMA's allocation of interpretive authority rather than by textual canons. *See* 22 U.S.C. § 4302(b)

19

("Determinations with respect to the meaning and applicability of the term[] [benefit] shall be committed to the discretion of the Secretary.").

Moreover, and even apart from considerations of deference, we doubt that *ejusdem generis* is relevant to this particular statutory provision. As we previously explained, we read the "other benefits" part of the definition for "benefits" as structurally separate from the enumeration in § 4302(a)(A)-(G). It follows that we do not regard "other benefits" as a general term that necessarily embraces the same object as the specific benefits identified; the second part of the definition is a delegation, not merely a "catch-all." *See Turkette*, 452 U.S. at 582 (explaining that where a statutory provision establishes two separate categories, and the second category does not itself contain a specific enumeration followed by a general description, "*ejusdem generis* has no bearing on the meaning to be attributed to" the second category). This conclusion is reinforced when we consider the category to which the City seeks to limit the term "benefits." While the specifically enumerated benefits in section 4302(a)(A)-(G) all plausibly fit within the category of generally-available items to which the State Department may restrict access in order impose sanctions, the FMA as a whole manifestly also contemplates benefits that do not fit within this limitation. Section 4303, for example, declares that the Secretary shall "[p]*rovide or assist in the provision of benefits* for or on behalf of a foreign mission in accordance with section 4304." 22 U.S.C. § 4303(2) (emphasis added). And the City fails to explain why the FMA would use words like "[p]rovide" and "assist" if benefits are confined to generally available items upon which the Secretary may only place restrictions or conditions. Additionally, section 4304(a) of the Act permits the Secretary to provide benefits to or for a foreign mission, "[u]pon the request of [that] foreign mission." If a benefit is always a generally available item, the

designation of which is meant to be used as a sanction, it is hard to understand why a foreign mission might *request* benefits.

2.

We next consider the City's argument that the FMA's purpose and history indicate that Congress intended to establish a limited and technical meaning of "benefit" that the Notice in this case contravened.

A review of the legislative history of the FMA suggests that the City correctly characterizes the primary mischief that Congress intended to address in the statute: the imposition of restrictions and burdens on U.S. missions overseas and the State Department's inability to respond with targeted and proportionate measures. Congress documented several examples of what it considered unfair treatment by foreign governments that impaired the ability of U.S. missions to purchase property abroad and to obtain facilities and services.[8] Congress also recognized that, at the time, the State Department did not have the legal tools to respond to such treatment because it "lack[ed] authority to impose similar restrictions or conditions on . . .

---

[8] The Senate Report for the Committee on Foreign Relations offered several examples, including (1) that in the Soviet Union and Eastern European countries, the United States was not permitted to purchase office and residential properties or even basic administrative support and services such as housing maintenance, utilities, or tickets for cultural events, and was instead required to obtain these items through government controlled organizations at a substantial surcharge, (2) that in several countries including Venezuela, Kuwait, Bahrain, the United Arab Emirates, and Indonesia, various restrictions were placed on the State Department's ability to purchase or own housing, (3) that in countries such as Mexico, Venezuela, Singapore, and Guatemala, inequitable restrictions were placed on the import and export of the private vehicles and other personal effects of diplomats, and (4) that inequitable taxes on goods and services such as gasoline, heating oil, and construction materials were imposed in several countries including in Chile, Malta, and Portugal. S. Rep. No. 97-283, at 2-3 (1981). The House Report for the Committee on Foreign Affairs specifically singled out "[t]he problem of taxation of diplomatic personnel" as "particularly vexing," observing that "many host governments" failed to live up their obligations under international agreements, such as the VCDR and VCCR, creating "considerable extra expense to Foreign Service members." H.R. Rep. No. 97-102, Pt. 1, at 26 (1981).

other countries in the United States" and was instead forced, if it was to act all, to "take far more extreme action such as barring the country from using property . . . or declaring some persons persona non grata." S. Rep. No. 97-283, at 3 (1981). These extreme remedies were not generally "suitable," Congress explained, and so they were "rarely used." *Id.* By contrast, the FMA provided "mechanisms whereby the operations of foreign missions in the United States and the benefits available to them from Federal, State and local authorities, public utilities, and private persons may be cleared through the Federal Government and adjusted according to United States needs" so that "the conditions under which foreign missions operate in the United States can be made to reflect the conditions under which missions of the United States are required to operate in the countries represented by such foreign missions." *Id.* at 1-2. In other words, the FMA allowed the State Department "to make the punishment fit the crime." H.R Rep. No. 97-102, Pt. 1, at 27 (1981) (internal quotation marks omitted).

We reject, however, the City's invitation to treat evidence that Congress passed the FMA in part to create a reciprocal-sanctions regime as proof that Congress intended to limit the State Department's authority to designate benefits to this function only. First, we find no evidence that Congress sought to proscribe the State Department from using benefits as "carrots" rather than as "sticks" in instances where the State Department believed that doing so would best advance the national interest and improve treatment for United Sates missions abroad. The State Department made just such a judgment in this case. The Notice a) describes how the tax treatment foreign missions have received in the United States has led to adverse "[r]esponsive measures taken against the United States" and b) explains why, if the United States were to pursue reciprocal retaliation rather than confer a positive benefit, it would likely leave the United States worse off. *See* 74 Fed. Reg. 31,788 ("As the largest foreign-government property owner

22

overseas, the United States benefits financially much more than other countries from an international practice exempting staff residences from real property taxes, and it stands to lose the most if the practice is undermined."). Of course, just because a certain diplomatic tool is desirable does not mean that Congress has authorized it. But in the context of a statute in which Congress has "expressed a clear intention that the executive branch's authority . . . be broad," *Palestine Info. Office*, 853 F.2d at 938, and in which Congress gave interpretive authority to the State Department to "avoid conflicting interpretations by . . . courts, " S. Rep. No. 97-283, at 7 (1981), it would be improper to read Congress's focus on the use of benefits as restrictions to exclude, implicitly, such other perfectly ordinary uses of "benefits."

Second, the legislative history suggests that in addition to providing the State Department with new authority to respond to the treatment of United States missions abroad, the FMA also had the purpose of giving the State Department the ability "to assist foreign missions, at their request, to obtain benefits" in order to "enhance the ability of foreign missions to conduct their representational duties in the United States." S. Rep. No. 97-283, at 8 (1981); *accord* H.R. Rep. No. 97-102, Part 1, at 31 (1981). This additional purpose, which is reflected in statute's statement of policy in section 4301(b), clearly contemplates the granting of affirmative benefits by the State Department.

Apart from the legislative history, the City also seeks to rely on the FMA's post-enactment regulatory history as providing support for its interpretation. The City contends that while the State Department has previously used the FMA to impose restrictions on specific foreign missions by placing conditions on their acquisition of property, goods or services, the Department has not historically attempted to use its authority under domestic law to grant legal exemptions. The fact that the FMA can be used (and indeed has been used) to impose reciprocal

23

sanctions does not, however, limit the State Department's authority to designate benefits in other ways that are also consistent with the statute. And in the context of a statute that was designed to facilitate flexibility, we do not believe that the supposed novelty of this benefit designation makes such a designation suspect.[9]

We therefore conclude that the FMA empowers the State Department to grant positive benefits, as well as to place restrictions on existing benefits.

C.

That the State Department is authorized to confer tax exemptions as "benefits" to foreign missions does not necessarily mean, however, that such benefits preempt State and local tax laws. Accordingly, we turn now to the question of the preemptive effect of the State Department Notice. A federal agency "may preempt state regulation and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law" provided the agency is "acting within the scope of its congressionally delegated authority." *City of N.Y. v. FCC*, 486 U.S. 57, 63-64 (1988) (internal quotation marks omitted); *see also SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 188 (2d Cir. 2007) ("Federal regulations have no less preemptive effect than federal statutes." (quoting *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982))). But "an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). In determining whether the Notice preempts the City's property

---

[9] The FMA has been used to designate a tax exemption in at least one other instance. In a notice issued in January 2009, the State Department designated an exemption from Federal and State or local excise taxes imposed with respect to tobacco products for foreign diplomatic and consular missions and personnel. *See Designation of Benefits Under the Foreign Missions Act; Diplomatic and Consular Exemption from Tobacco Excise Taxes*, 74 Fed. Reg. 5019 (Jan. 28, 2009). The Government represents to us that this notice reaffirmed a designation made in 1998, though there is no indication in the 2009 notice that this is so.

tax laws, we must therefore answer two questions: (1) whether the action taken by the State Department in the Notice was intended to preempt the City's property tax laws, and if so (2) whether the State Department acted within the scope of its delegated authority in preempting those laws. *See Drake v. Lab. Corp. of Am. Holdings*, 458 F.3d 48, 56 (2d Cir. 2006).

The answer to the first question is not in doubt: The State Department expressly addressed the preemptive effect of the Notice, and provided that "any state or local laws to the contrary [of the Notice's benefit designation] are hereby preempted." 74 Fed. Reg. 31,788. And even aside from that explicit assertion, it is clear that the City's property taxes cannot coexist with the State Department's Notice, and so, if the latter is valid, it must prevail. *See Blum v. Bacon*, 457 U.S. 132, 145-46 (1982); *see also Wyeth v. Levine*, 129 S. Ct. 1187, 1200-01 (2009) (recognizing that an agency regulation with the force of law can preempt conflicting state requirements when the court determines that there is a conflict).

We also answer the second question in the affirmative. The State Department acted within its statutory authority in recognizing a property tax exemption as a benefit that has the effect of preempting the City's inconsistent tax laws. In reaching this conclusion, we reject the City's contention that section 4307—which provides that nothing in the FMA "may be construed to preempt any State or municipal law or governmental authority *regarding zoning, land use, health, safety, or welfare,* except that a denial by the Secretary involving a benefit for a foreign mission within the jurisdiction of a particular State or local government shall be controlling," 22 U.S.C. § 4307—precludes the State Department from granting a benefit that affirmatively displaces State or local tax laws. The problem with the City's argument is apparent from the text of section 4307 emphasized above. Section 4307 does not bar the State Department from providing benefits that contravene *all* local laws. Rather, by its terms it specifically shields only

25

those State or local laws "regarding zoning, land use, health, safety, or welfare." The section is tellingly silent with regard to State and local tax laws.

Attempting to resist this textual implication, the City argues that the section implicitly forbids any preemption that it does not explicitly authorize. That is, according to the City, the provision allows the State Department to exercise "negative preemption"[10] by issuing "controlling" denials of benefits that trump contrary zoning, land use, health, safety, or welfare laws that would normally make such benefits available, 22 U.S.C. § 4307, but it does not otherwise allow the State Department to displace State or local law. The City's argument for this interpretation relies primarily on its view of the legislative history of section 4307, as well as on background norms of interpretation that establish a presumption against preemption when Congress authorizes regulatory action in an area that the States have traditionally occupied, *see Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008).

With respect to the presumption against preemption, we can readily assume the existence of such a presumption. But we do not believe it affects the issues disputed in this case. As the Supreme Court has explained, the presumption against preemption is relevant to assessing "whether a given state authority conflicts with, and thus has been displaced by, the existence of Federal Government authority." *New York v. FERC*, 535 U.S. 1, 17-18 (2002). The presumption also operates when there is doubt about whether Congress intended to provide an agency with

---

[10] The City draws this term from the FMA's legislative history. *See infra* **[Draft at 29-31]**. The term is meant to express the idea that the State Department could tell cities and states what *not* to do with respect to certain matters (*e.g.* instructing a city not to allow a mission to relocate at a certain location) but could not impose affirmative obligations on the city or state in those areas (*e.g.* by requiring a city to allow a foreign mission to locate in a certain location in contravention of that city's zoning laws). The term "negative preemption" has been used for different and entirely distinct purposes by other courts. *See, e.g.*, *Fellner v. Tri-Union Seafoods, LLC*, 539 F.3d 237, 247 n.6 (3d Cir. 2008) (describing preemption of state law through deliberate federal inaction as "negative preemption").

26

the authority to preempt. *See N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 123 (2d Cir. 2009) ("[W]here the text of a preemption clause is ambiguous . . . , courts 'have a duty to accept the reading that disfavors pre-emption.'") (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)). But neither matter is in doubt here; there is no question that the City's property tax law conflicts with the State Department Notice and that the State Department intends to supersede that tax law. Instead, the dispute is about whether the State Department acted lawfully by seeking to preempt State and municipal tax law. Resolving this question requires us to determine whether the State Department acted within the scope of its congressionally delegated authority, and that is a matter of statutory interpretation that proceeds, in the absence of ambiguity, "without any presumption one way or the other." *New York*, 535 U.S. at 18. It is to this inquiry that we now turn.

The language, structure, and subject-matter of the FMA all strongly indicate that Congress meant to give the State Department authority to designate benefits that might conflict with and therefore preempt State and local law. *See La. Pub. Serv. Comm'n*, 476 U.S. at 374 ("[T]he best way of determining whether Congress intended the regulations of an administrative agency to displace state law is to examine the nature and scope of the authority granted by Congress to the agency."). As we have already explained, the FMA's delegation of authority to the State Department is exceptionally broad. The Secretary of State is given the power not only to designate benefits, 22 U.S.C. § 4302(a), but also to make "[d]eterminations with respect to the meaning and applicability" of that term, *id.* § 4302(b). More generally, the Act specifies that "[e]xcept as otherwise provided, *any* determination required under [the FMA] shall be committed to the discretion of the Secretary." *Id.* § 4308(g) (emphasis added). Furthermore, these allocations are made in the context of foreign affairs, "the precise realm in which the

27

Constitution accords [the executive branch] greatest power," *Palestine Info. Office*, 853 F.2d at 934, and which is also an area in which there is often a need for the Nation to speak with one voice, *see Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396, 413-14 (2003).

The "plenitude of Executive authority," given to the Secretary of State to regulate foreign missions under the FMA controls the question of whether the State Department acted permissibly in designating a tax exemption benefit that preempted inconsistent State and local tax law. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 365, 376 (2000) (concluding that the fullness of Presidential authority delegated by Congress to impose calibrated sanctions and use economic leverage against a foreign country "controll[ed] the issue of preemption"). By granting the State Department the power to implement an expansive statutory term—"benefit"— and by providing the Department with significant discretionary authorities designed to achieve a foreign affairs objective, the FMA authorizes the Department to take actions that preempt conflicting State or local laws that implicate the Department's supervisory function over foreign missions. *Cf. id.* ("It is simply implausible that Congress would have gone to such lengths to empower the President if it had been willing to compromise his effectiveness by deference to every provision of state statute or local ordinance that might, if enforced, blunt the consequences of discretionary Presidential action."). The FMA authorizes preemption, that is, unless, as the City argues, section 4307 constitutes statutory language to the contrary.

But, understood in context, section 4307 supports, rather than detracts from, our conclusion that the State Department acted within the scope of its statutory authority. That section demonstrates that Congress recognized that the State Department might wish to designate benefits that contravened State or local law, and that Congress chose to limit the State Department's authority over some of these laws, namely State or local *police powers*, to negative

28

preemption only. The City's argument to the contrary notwithstanding, section 4307 cannot in its natural meaning be read as describing the FMA's full-preemptive scope, but rather as a savings cause that insulates certain listed State and municipal powers from preemption. As such, section 4307 provides additional support for the conclusion that the State Department has the power to preempt any and all State and local laws that are not specifically protected. *See Drake*, 458 F.3d at 62 ("[A] narrow saving clause may in some contexts support an inference that preemption is otherwise broad . . . .").

The legislative history of section 4307 of the FMA, which the City recounts at length, if anything gives further backing to this interpretation. While the legislative history confirms that Congress was concerned about preemption under the FMA and attempted to balance carefully the diplomatic interests of the federal government against the interests of State and local governments, it in no ways suggests that Congress intended for section 4307 to impose limits on the State Department's ability to designate tax exemptions with preemptive effect.

The original Senate and House bills contained a different preemption provision from the one that was ultimately enacted into law as section 4307. It read:

> Notwithstanding any other provision of law, no act . . . of any State or municipal government authority shall be effective to confer or deny any benefits with respect to any foreign mission contrary to this title.

S. 854, 97th Cong. § 207, *reproduced in* S. Rep. No. 97-329, at 32 (1981); H.R. 3518, 97th Cong. § 207, *reproduced in* H.R. Rep. No. 97-102, Pt. 1, at 62 (1981). According to the reports of both the House and Senate Committees on Foreign Affairs, this provision "declare[d] the preemptive effect of the exercise of Federal jurisdiction with regard to the conferring or denying of benefits (including the location or use of real property) which are regulated by this title." S. Rep. No. 97-283, at 15 (1981); H.R. Rep. No. 97-102, Part 1, at 36 (1981). The breadth of this preemption provision drew opposition, much of which was directed at the possibility that the

29

FMA might conflict with local zoning laws and with home rule for the District of Columbia (which was implicated by section 206—codified at 22 U.S.C. § 4306—addressing the location of foreign missions in Washington D.C., as well as by the more general provisions regarding benefits).

The State Department tried to address these concerns. The Assistant Secretary of State for Administration sent a letter to the Senate discussing the preemptive scope of section 207 and what effect it would have on "state or municipal land use processes, in connection with regulation of the location and size of the foreign missions." *See* Letter from Thomas M. Tracy, Assistant Sec'y of State for Admin., to William V. Roth, Chairman, Governmental Affairs Comm., U.S. Senate (Mar. 4, 1982), *reproduced in* S. Rep. No. 97-329, at 5 (1981). The letter explained that such state and local authorities were "not affected, with the exception that the Secretary . . . may disqualify a foreign government from obtaining or retaining official facilities in any location in the United States." *Id.* The Governmental Affairs Committee Report acknowledged that some members were concerned because Mr. Tracy's interpretation—which the Committee understood to describe a "'negative veto'"—was not then reflected in the text of the bill, but the majority of the committee ultimately shared Mr. Tracy's view that the statute did not interfere with or preempt local zoning and regulatory policies. *See* S. Rep. No. 97-329, at 16-17 (1981). On the issue of Washington D.C. home rule, the Committee acknowledged that section 206 did allow for the preemption and alteration of zoning and land use regulations, but concluded that in other respects "District of Columbia laws and ordinances, including *tax* and penal codes, [could not] be preempted by th[e] legislation." *Id.* at 17 (emphasis added).

Some in the Committee were not mollified. Five senators recorded their "minority views" and "object[ed] to the broad federal preemption language of sec. 207 of the bill." *Id.* at

30

42 (minority views). They believed that "the effect of this provision would be to override not only [laws in the] District of Columbia, but also other municipalities' and states' laws concerning such things as zoning for consulates; building . . . codes . . .; *tax codes*; police powers and penal codes." *Id.* (emphasis added). The senators feared that if the Secretary, in her discretion, determined to "confer or deny any of the kinds of 'benefits'" under the FMA, those benefits would be conferred or denied "regardless of the requirements of local or state law." *Id.* The senators argued that such a "sweeping preemption of federal, state, and local law" was not necessary to accomplish diplomatic reciprocity and was not required by the terms or intent of the VCDR. *Id.* They also rejected the Assistant Secretary's assurance "that a negative preemption was all that was intended" because they concluded that section 207 was "not so narrowly drawn." *Id.* at 43. The senators reported that these concerns about state and local autonomy were shared by "the National League of Cities, the U.S. Conference of Mayors, and several State Attorneys General." *Id.*[11]

In the end, section 207 was amended at conference to its present form. Under it, the reference to State or municipal laws being preempted was altered so that, as to "any State or municipal law or governmental authority regarding zoning, land use, health, safety, or welfare," only negative preemption was permitted. 22 U.S.C. § 4307.

We recognize that the minority views of the Report for the Senate Governmental Affairs Committee demonstrate that there were some members of Congress who did not wish to give the State Department the authority to do what it has done in the Notice: override State and municipal

_____

[11] Another Senator, David Durgenberger, appended his own views to the Report. He indicated general support for the bill but expressed concern about the "overreaching effects of Section 207" and the possibility that it would undermine decisions by local zoning boards. *See* S. Rep. No. 97-329, at 53 (1981) (additional views of Sen. Durenberger).

tax laws. *See* S. Rep. No. 97-329, at 42 (1981) (minority views). It is also possible to read the majority report of that Committee as reflecting a view that—before the statutory language was altered—the FMA did not actually provide the State Department with this power. *See id.* at 17. But when section 4307 was changed to its present form, the modified provision stated that preemption of areas like zoning and land use was limited to the exercise of a negative veto, and significantly said nothing whatever about tax laws. This silence is conspicuous. Where the record indicates that there were concerns within Congress that the FMA would empower the State Department to preempt affirmatively a variety of State and local laws *including tax laws*, we cannot read a statutory modification that limited the State Department's ability to preempt affirmatively *some* of those laws—not including tax laws—as implicitly barring affirmative preemption of other local laws, and specifically tax laws.[12]

## III.

Having concluded that the State Department's decision to create an exemption from all property taxes (including State and local taxes) for property owned by foreign governments and used to house staff of permanent missions and consular officers was within the Department's

---

[12] There is one phrase in the Conference Report of the FMA discussing section 4307 as modified that could be read to support the City's position. In the middle of various statements regarding this provision, there appears the following:

> Should a State or local governmental entity wish to deny benefits which it is not obliged to grant, contrary to a determination by the Secretary of State that such benefits should be granted, the matter would, as under present practice, be subject to resolution through discussions between the Department of State and the State or local governmental entity.

H.R. Rep. No. 97-693, at 43 (1982) (Conf. Rep.). But in context, it is clear that the Report was referencing benefit determinations relating to enumerated police powers—such as the authorization for a mission's location—that the State Department cannot compel a State or municipality to accept under section 4307. As to these benefit designations, discussions in lieu of preemption were appropriate.

32

authority under the FMA, we now consider whether the Notice also invalidates taxes previously assessed by the City and nullifies the City's tax liens. Once again, our inquiry involves two questions: (1) Does the language of the Notice require that it be given retroactive effect? And if so, (2) has Congress provided the State Department with statutory authority to exempt missions from taxation retroactively? *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208-09 (1988); *Rock of Ages Corp. v. Sec'y. of Labor*, 170 F.3d 148, 158 (2d Cir. 1999).

The language of the Notice clearly resolves the first question. The Notice states: "The exemption from real property taxes provided by this designation and determination shall apply to taxes that *have been* or will be assessed against any foreign government with respect to property subject to this determination, and shall operate to nullify any existing tax liens with respect to such property . . . ." 74 Fed. Reg. 31,788 (emphasis added).[13] And there can be no doubt that what the State Department has done is to create a retroactive rule because it "attaches a new disability" to prior tax assessments made by the City in the form of invalidation through federal preemption. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994) (explaining that laws "which take[] away or impair[] vested rights acquired under existing laws, or create[] a new obligation, impose[] a new duty, or attach[] a new disability, in respect to transactions or considerations already past, must be deemed retrospective" (internal quotation marks omitted)).

We therefore turn to whether the State Department had the statutory authority to confer such a retroactive property tax exemption.

A.

---

[13] The Notice does not, however, require a refund of taxes previously paid. *See* 74 Fed. Reg. 31,788 ("The exemption . . . shall not operate to require refund of any taxes previously paid by any foreign government regarding such property.").

"Retroactivity is not favored in the law." *Sweet v. Sheahan*, 235 F.3d 80, 89 (2d Cir. 2000) (quoting *Bowen*, 488 U.S. at 208). Courts, accordingly, have regularly employed a presumption against retroactivity as a default rule for statutory interpretation. *See Landgraf*, 511 U.S. at 272-73. As applied to rulemaking by executive agencies and departments, this presumption against retroactivity means that "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen*, 488 U.S. at 208; *accord Rock of Ages Corp.*, 170 F.3d at 158.[14] "Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant." *Bowen*, 488 U.S. at 208-09.

---

[14] Our cases considering whether agencies have been delegated the authority to promulgate rules with retroactive effect have generally relied on the same presumption against retroactivity that has been recognized for statutory interpretation. *See, e.g.*, *Rock of Ages Corp.*, 170 F.3d at 158. Indeed, in *Bowen*, the Supreme Court referenced the general presumption against retroactivity for the interpretation of congressional enactments and legislative rules, and then added that "[b]y the same principle" statutory grants of legislative rule making authority should not ordinarily be interpreted to include the power to issue retroactive rules. 488 U.S. at 208.

Beyond this general presumption, some circuits have interpreted the APA to impose an additional bar to retroactive rulemaking, because of the APA's definition of a "rule" to mean "an agency statement of general or particular applicability and *future effect*," 5 U.S.C. § 551(4) (emphasis added). *See, e.g.*, *Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 588 (D.C. Cir. 2001); *Nat'l Med. Enters., Inc. v. Sullivan*, 957 F.2d 664, 671 (9th Cir. 1992); *see also Bowen*, 488 U.S. at 216, 224 (Scalia, J., concurring) (arguing that the plain meaning of the APA's definition for "rule" precludes an agency from adopting rules that have a primary retroactive effect in the sense of changing what the law was in the past without "some special congressional authorization").

Our court has left open the question of whether and when a rule promulgated pursuant to the APA is permitted to be retroactive. *See NLRB v. Long Island Coll. Hosp.*, 20 F.3d 76, 81 n.6 (2d Cir. 1994). In the case before us, neither the parties nor the Government has briefed the question of whether the APA establishes an obstacle to retroactive rule making that is independent of the *Landgraf/Bowen* presumption. We therefore do not consider the argument properly raised and decline to consider it here. *See T. Co. Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 346 n.10 (2d Cir. 2010).

The Government argues that the presumption against retroactivity is not relevant to this case because the Notice involves Executive action in the foreign affairs context and because it implicates only public, rather than private, rights.  For this proposition, it relies by analogy on *Republic of Austria v. Altmann*, 541 U.S. 677 (2004), where the Supreme Court declined to apply an antiretroactivity presumption to the FSIA, and held that the FSIA standards for sovereign immunity apply to claims based on conduct predating the FSIA's enactment.  *See id.* at 696-97; *see also Republic of Iraq v. Beaty*, 129 S. Ct. 2183, 2194 (2009) (finding the presumption against retroactivity inapplicable to an appropriations act that authorized the President to waive the application of the FSIA's state sponsor of terrorism exception to Iraq).

To the extent the Government contends that the presumption against retroactivity is always inapplicable to cases involving public rights in the foreign affairs context, it over-reads *Altmann*.  The Government highlights the statement in *Altmann* that though the antiretroactivity presumption is "not strictly confined to cases involving private rights, it is most helpful in that context."  541 U.S. at 696.  As we discuss below, that recognition by the Court offers an important insight into the relations between the substantive values underlying the antiretroactivity presumption and the presumption's application.  But the statement does not suggest that the presumption against retroactivity is generally inapplicable when only public rights are implicated.  The law has long been to the contrary, and *Altmann* cannot be read to abrogate those decisions *sub silentio*.  *See Landgraf*, 511 U.S. at 271 n.25 ("While the great majority of [Supreme Court] decisions relying upon the antiretroactivity presumption have involved . . . burden[s on] private parties, [the Supreme Court] ha[s] applied the presumption in cases involving new monetary obligations that fell only on the government."); *United States v. Magnolia Petroleum Co.,* 276 U.S. 160, 162-63 (1928) (applying the presumption against

35

retroactive legislation to conclude that the taxpayer was not entitled to the benefit of an intervening statute that established a more taxpayer-favorable rule for calculating tax refunds owed by the federal government); *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 87 n.16 (2d Cir. 2006) (applying the presumption against retroactivity to a Medicare regulation because the regulation would impose new obligations on the Secretary of Health and Human Services with respect to a completed transaction, and finding it "immaterial" that the new payment obligation would fall on the Government rather than on a private party). Indeed, the holding in *Altmann* is explicitly limited to the "*sui generis* context" of the FSIA. 541 U.S. at 696.

The Government also has no support for the suggestion that the presumption is inapplicable because foreign affairs are implicated. Though, in *Altmann*, the issue of sovereign immunity obviously arose in the foreign affairs context, this was not the basis for the Court's holding in that case. Instead, the *Altmann* decision relied on the nature of sovereign immunity laws, which are quasi-jurisdictional in nature and are not designed to encourage primary conduct on the part of the immune sovereign or to provide a basis for reliance interests. *See id.* ("[T]he principal purpose of foreign sovereign immunity has never been to permit foreign states and their instrumentalities to shape their conduct in reliance on the promise of future immunity from suit in United States courts. Rather, such immunity reflects current political realities and relationships, and aims to give foreign states and their instrumentalities some present protection from the inconvenience of suit as a gesture of comity." (emphasis and internal quotation marks omitted)).[15]

_____

[15] The Executive's ability to resolve, in some circumstances, pending claims brought against foreign sovereigns pursuant to Executive Agreements, *see, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981), also does not undermine the existence of the antiretroactivity presumption as applied to foreign affairs as a general matter. Judicial acceptance of the Executive's power to settle the claims of its nationals against foreign countries by Executive

36

Nevertheless, we do find *Altmann* instructive. It reminds us that "the antiretroactivity presumption is just that—a presumption, rather than a constitutional command."[16] 541 U.S. at 692-93. And it demonstrates that the force of the presumption depends on the values that underlie it and the degree to which such values are at issue.

Retroactive laws are not always pernicious. They may "serve entirely benign and legitimate purposes," such as responding to emergencies, correcting mistakes, preventing attempts to undermine the transition to new legal rules, or simply giving comprehensive effect to a desirable policy change. *Landgraf*, 511 U.S. at 267-68. But retroactive lawmaking (whether by legislation or regulation) typically risks unfairness. *See Eastern Enters. v. Apfel*, 524 U.S. 498, 533 (1998). Retroactive laws can be used for "retribution against unpopular groups or individuals." *INS v. St. Cyr*, 533 U.S. 289, 315 (2001) (quoting *Landgraf* 511 U.S. at 266); *accord Doe v. Pataki*, 120 F.3d 1263, 1273 (2d Cir. 1997). They frequently upset settled expectations by imposing burdens and disabilities with respect to completed transactions and actions. *See Altmann*, 541 U.S. at 696; *Landgraf*, 511 U.S. at 270; *General Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992). And they may undermine rule-of-law values that enable

---

Agreement in order to resolve a major foreign policy dispute does not mean courts will presume that the Executive Department may retroactively abrogate legal obligations foreign governments owe to public or private entities in this country. *See Dames & Moore*, 453 U.S. at 688 (underscoring "the narrowness" of the Court's decision, and cautioning that the Court did "not decide that the President possesses plenary power to settle claims, even as against foreign governmental entities"). The President's authority to enter Executive Agreements to settle civil claims between American citizens and foreign governments or foreign nationals is predicated on a "history of congressional acquiescence" to these agreements that is treated as a "gloss on Executive Power." *See Medellin v. Texas*, 552 U.S. 491, 531-32 (2008) (emphasizing that this Executive authority is "narrow and strictly limited") (internal quotation marks omitted in text).

[16] Except of course for when the rule *reflects* a specific constitutional command. *See Landgraf*, 511 U.S. at 266-67 (discussing these Constitutional provisions that impose antiretroactivity principles such as the *Ex Post Fact* Clause, the Fifth Amendment's Takings Clause, and the prohibitions on "Bills of Attainder" in Art. I, §§ 9-10).

people to know what the law is, and to have confidence about the legal consequences of their actions. *See Landgraf*, 511 U.S. at 265-66. A default rule that requires Congress to make a clear statement when it wishes legislation to have retroactive effect—or when it wishes to empower an agency to issue retroactive rules—helps to minimize these risks by assuring "that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." *Id.* at 272-73. This requirement also fosters political accountability, by "allocat[ing] to Congress responsibility for fundamental policy judgments concerning the proper temporal reach of statutes." *Id.* at 273.

In view of the values the presumption against retroactivity is designed to serve, it is not surprising that it has most frequently been applied in cases involving contractual or property rights, where "predictability and stability are of prime importance," *id.* at 271 & n.25, and especially to cases involving private rights, where it is particularly undesirable—unfair even—to undermine good-faith reliance on established legal rules, *see Altmann*, 541 U.S. at 696. But where the evils of retroactivity are not present, the strength of the antiretroactivity presumption may be correspondingly diminished both because the presumption is less likely to reflect the intent of a reasonable legislator and because it is not needed to promote Congressional accountability. *Cf. Landraf*, 511 U.S. at 272-73. In such circumstances, it may become necessary for a court to look to the statute as a whole and to determine, even in the absence of a clear statement, whether Congress meant the statute to have retroactive effect, or, in the case of a delegation, whether Congress intended to have the statute authorize retroactive executive rulemaking. Thus, in *Altmann*, the Court declined to rely on the absence of a clear statement in the FSIA and applied the FSIA to pre-enactment conduct. It did so after recognizing that retroactive application of the statute would not a) affect private rights, or b) upset significant

reliance interests (because sovereign immunity laws are not meant to create reliance). *See* 541 U.S. at 696. We find similar considerations relevant in the instant case, and these lead us to conclude that the FMA gave the State Department the power to confer a retroactive tax exemption to foreign missions.

First, the State Department Notice implicates only the public rights of States and municipalities, not of private persons. We have explained that under our case law, this fact is not independently sufficient to negate the antiretroactivity presumption. *See Yale-New Haven Hosp.*, 470 F.3d at 87 n.16. But when it is combined with other factors that suggest that the typical costs of retroactivity are not at stake, it is germane. The City is not a politically weak actor. And while there is perhaps some unfairness to the City when the federal government retroactively declares property taxes imposed by the City against foreign countries to be null and void, this unfairness inheres in the federal government's unquestioned supremacy in the management of foreign relations. *Cf. United States v. Cnty. of Arlington, Va.*, 702 F.2d 485, 488 (4th Cir. 1983) ("Maintenance of friendly relations with foreign powers transcends in importance municipal taxation. The County must yield in the interests of us all, itself included . . . ."). In other words, this is manifestly not a case where retroactive lawmaking is being used to burden an unpopular or underrepresented person, group, or entity.

Second, and most important, the Notice does not upset expectations that were genuinely settled. It is true that this suit, which was brought to establish the validity of the City's tax liens, involves "rights in . . . property," *see Permanent Mission of India to the United Nations*, 551 U.S. at 202 (internal quotation marks omitted), an area in which reliance interests are particularly strong, *see Landgraf*, 511 U.S. at 271 & n.25. Yet the property interests at stake here are based on the City's right to impose and to collect property taxes against portions of foreign missions

used for staff housing, and the status of such rights has long been uncertain. Both the India Mission and the Mongolia Mission have consistently taken the position that their entire buildings, including those portions used for staff residences, are tax exempt under the VCCR and the VCDR. We need not decide today whether the Missions' interpretation of these treaties is correct. But we do think that the Missions' arguments have considerable force, and we find this fact relevant in assessing the degree to which the State Department Notice undermined the City's preexisting expectations.

As described earlier, the VCDR exempts from taxation "the premises of the mission," VCDR art. 23, 23 U.S.T. 3227, which are defined as "the buildings or parts of buildings . . . used for the purposes of the mission, including the residence of the head of the mission," *id.* art. 1(i). Similarly, the VCCR establishes a tax exemption for "[c]onsular premises and the residence of the career head of consular post." VCCR, art. 32, 21 U.S.T. 77. The District Court held that because the VCCR and the VCDR specifically recognize a tax exemption for the residences of the "career head of consular post" and "the head of the mission," the treaties implicitly exclude tax exemptions for any other residences. *See Permanent Mission II*, 533 F. Supp. 2d at 460-61. We are not convinced that this conclusion necessarily follows.

We agree that under the treaties, the only residences that are *categorically* exempt from taxation are those belonging to the head of mission and the head of the consular post respectively. And, indeed, the Missions do not argue that staff residences are always exempt from taxation. Rather they contend that such residences are exempt to the extent they are part of the "consular premises" and "the premises of the mission" that are tax exempt. Moreover, they concede that not all staff residences would fit this description. But they argue that a residence is part of a "consular premises," if it is "used exclusively for the purposes of the consular post,"

40

VCCR art. 1(j), and similarly that a residence is part of the "premises of the mission" if it is part of the buildings "used for the purposes of the mission," VCDR art. 1(i).

Under this interpretation of the treaties, it would essentially become a mixed question of law and fact whether India and Mongolia are using staff residences for the purposes of the mission or exclusively for the purposes of the consular post. In the instant case, the Missions insist that the residences serve significant mission and consular functions because they are located in a single facility that also houses diplomatic offices. This arrangement, the Missions argue, enables staff to be on hand to work at odd hours as required by the time difference between New York City and their home countries, facilitates cost-effective security, and allows staff to participate in cultural events.

We do not today hold the Missions' interpretation of the VCCR and the VCDR to be correct; there are significant arguments that go in the other direction. We disagree, though with the District Court's conclusion that the "plain language of the VCCR and the VCDR unequivocally supports the City's position." *Permanent Mission II*, 533 F. Supp. 2d at 461. Instead, we find the proper scope of the tax exemptions in these treaties decidedly ambiguous— a judgment its drafters might well have shared. [17] In so regarding the treaties' language, we are

[17] Ernest L. Kerley, one of the United States' treaty negotiators for the VCDR, wrote the following in the 1962—after the treaty was opened for signature but before it had been ratified by the United States—about tax exemption under article 23:

> Since the term "premises of the mission" is defined in Article 1(i) of the convention, the property to which the exemption granted by this article applies is determinable: it applies to the buildings or parts of buildings and the land ancillary thereto used for the purposes of the mission, including the residence of the head of mission. Whether realty held by the sending state as residences for members of the staff of the mission would be immune, would depend on the scope of the term "purposes of the mission." Is the housing of members of the staff of the mission, especially the senior personnel who are expected to entertain members of other missions and of the government of the receiving state, a mission purpose? The use of the word "including" in Article 1(i) does not exclude an

41

in accord with the view—though not necessarily the final conclusion—expressed by the Fourth Circuit in *County of Arlington*, 702 F.2d 485, which is the only federal appellate decision to have addressed whether the tax exemption in Article 23 of the VCDR applies to residential housing for mission staff.[18]  The *County of Arlington* court acknowledged several possible arguments in favor of an exemption, including one akin to the argument rejected by the District Court in this case.  *See id.* at 487-88 ("While the residence of the head of mission is specifically mentioned as a mission purpose, there is no language compelling a conclusion that living quarters of other mission staff are not also a mission purpose.").  The court ultimately endorsed the United States' "candid[] conce[ssion]" in its briefing for that case that the relevant provisions of the VCDR are "ambiguous with respect to the tax immunity of the property in question," and the court itself stated that "[t]here are interpretations [of the VCDR] calling for tax-exemption at least as tenable as those to the contrary."  *Id.* at 487-88.  With the question of interpretation in equipoise, the Court relied on the position of the State Department—which based its view on "generally accepted principle[s] of customary international law"—to "tip[] the scales" in favor of finding an exemption for the staff residences.  *Id.* at 488.

The City denies that, in the past, there was ever any uncertainty about whether embassy properties used to house staff would be subject to taxation.  It points to guidance documents published by the State Department prior to the 2009 Notice, which stated that "[a]bsent a

---

affirmative answer.  . . . The discussions at the Conference do not clarify this problem.

Ernest L. Kerley, *Some Aspects of the Vienna Conference on Diplomatic Intercourse and Immunities*, 56 Am. J. Int'l L. 88, 109 (1962).

[18] Because of the substantial similarities between the language and structure of the VCCR and the VCDR on the issue of the tax status of staff residences, we consider the Fourth Circuit's reasoning relevant to the VCCR as well.

bilateral agreement, property tax exemption is not generally granted to residences owned by foreign governments used to house members of consular posts or international organizations, except . . . for career heads of the consular posts or chiefs of missions to the international organizations." *See* U.S. Dep't of State, *Foreign Diplomatic and Consular Personnel in the United States: Guidance for Administrative Officers* (the "*Guidance*") § 7.8 (2007), *available at* http://www.state.gov/documents/organization/126637.pdf. More directly on point, the City notes that the State Department made similar statements regarding staff residences for permanent missions to the United Nations in New York City, and even made such statements to the India Mission with respect to the building at issue in this case.[19]

---

[19] The State Department issued a Diplomatic Note to the India Mission in 1993 "remind[ing]" the Mission that

> exemption from property taxes is available only for that portion of the building used to house the Permanent Mission, which the United States Mission understands will occupy the first four floors of the building, and the residences of the Permanent Representative and the Consul General. The remainder of the building . . . will be subject to New York City property taxes. Therefore, the Mission is encouraged to work with the City of New York to allocate the taxable and non-taxable portions of the structure and to settle other outstanding tax issues relating to the property.

Diplomatic Note HC-06-93 (Feb. 17, 1993). The State Department then reiterated this position in another Note it sent in 2001 to all United Nations missions:

> The government- or mission-owned residence of any individual at the Permanent Mission with the title of Ambassador or Minister Plenipotentiary . . . is also exempt from property tax under New York Real Property Tax Law [§] 418. The residence of the Chief of Mission of a consular post enjoys tax exemption under the [VCCR]. All other residential property owned by the Permanent Mission or the sending state and occupied by a diplomat or mission member of lesser rank is subject to property tax . . . .

Diplomatic Note HC-12-01 (Apr. 5, 2001).

The City also dismisses the significance of the *County of Arlington* decision. Beyond arguing that the decision is "unpersuasive"—a view shared by the District Court in this case, *see Permanent Mission II*, 533 F. Supp. 2d at 461 n.2—the City contends that the State Department subsequently appeared to limit the position it took in the *County of Arlington* litigation to apply only to bilateral missions located in Washington, D.C., and not to missions, typically located in places like New York City, to international organizations like the United Nations. *See Guidance* § 7.8 ("In 1987, exemption from dues and taxes was extended on a reciprocal basis to other foreign government-owned residences used to house members of diplomatic missions in the Washington metropolitan area.").

We do not deny that the City had a good-faith belief that it would be able to impose property taxes on the staff residences for the Missions. But that does not alter the fact that the right to impose taxes was anything but settled prior to the Notice. The governing language of the VCDR and VCCR is ambiguous; the leading federal appellate court decision rejected the City's interpretation of these treaties and recognized a tax exemption for an apartment building located in Arlington, Virginia that housed the staff of a foreign mission to the United States; the State Department issued a public notice subsequent to that decision affirming its position that, at least with respect to bilateral missions, "property owned by diplomatic missions used to house the staff of such missions is exempt from general property tax, subject to reciprocal treatment of comparable property owned by the United States abroad," *Public Notice 975: Property Owned by Diplomatic Missions and Used to House the Staff of Those Missions is Exempt From General Property Taxes*, 51 Fed. Reg. 27,303, 27,304 (July 30, 1986);[20] and while the City points to

---

[20] This position was reaffirmed on multiple occasions. *See* Diplomatic Note 06-01, at 11 (Apr. 12, 2006), *available at* http://www.state.gov/documents/organization/125059.pdf ("Properties owned by foreign governments and used as residences of the members of the

44

several statements issued by the State Department that suggest staff residences for missions to the United Nations and consular offices were considered taxable, none of these statements either a) explain why the Department considered these properties taxable even though analogous properties held by bilateral missions to the United States were not, or b) address whether residential housing located on the same premises as diplomatic offices might serve the purposes of a mission or consular office.[21]

For these reasons, we find that the presumption against retroactivity is not determinative in this case. We emphasize that our holding on this issue is narrow. We do not adopt the Government's contention that the antiretroactivity presumption is generally inapplicable to foreign affairs cases involving public rights. Rather, we conclude that in the circumstances of

---

diplomatic mission accredited to the United States may also be granted exemption on the basis of the Vienna Convention on Diplomatic Relations, customary international law and reciprocity."); Diplomatic Note to Sweden (July 18, 2001), *available at* http//www.state.gov/s/l/22686.htm (describing and endorsing conclusion reached in the 1986 notice that recognizes that "the nearly uniform custom and practice of States have ripened into a customary law obligation to provide tax exemption to Government owned residences housing members of the diplomatic mission, subject to reciprocity").

[21] In addition, the nature of the City's prior right to tax these buildings—to the extent it existed—and its property interest in the tax liens on the buildings was always circumscribed by the particular difficulties inherent in collecting such taxes. Even though the City is not barred by the FSIA from obtaining declaratory judgments to establish the validity of its tax liens, *see Permanent Mission of India*, 551 U.S. at 195, the FSIA prevents the City from foreclosing against the Missions to enforce any judgments, *see id.* at 196 n.1; 28 U.S.C. § 1610(a)(4)(B). For that reason, the City's ability to vindicate its asserted interests in taxes owed on the Missions' property was always to some degree contingent on the cooperation of foreign sovereigns or on action by the United States federal government. *See Permanent Mission of India*, 551 U.S. at 196 n.1 (describing the ways in which a declaratory judgment on the validity of the City's tax liens could benefit the City including, *inter alia*, a) the tradition of compliance by foreign sovereigns to final judgments on tax liability, and b) the prospect that foreign aid by the United States to countries would be reduced by 110% of the outstanding debt pursuant to Congressional appropriations legislation). In that regard, the City's interest was tied up with "political realities and relationships" involving foreign sovereigns, *Altmann*, 541 U.S. at 696, which makes it different from standard property interests, even including those asserted by public entities.

this case, application of the antiretroactivity clear statement rule is misplaced because the values that underlie that rule are not sufficiently implicated.

B.

While the FMA does not contain the sort of *express* authorization for the State Department to issue a rule that operates retroactively that overcoming full application of the antiretroactivity presumption would require, *see Rock of Ages Corp.*, 170 F.3d at 158, we believe that the statute is best read to permit the State Department to do what it seeks to do and apply the exemption to "taxes that have been . . . assessed" and to "nullify any existing tax liens," 74 Fed. Reg. 31,788. This follows not only from the FMA's substantial delegation of discretionary authority to the State Department, but also from the criteria guiding the Secretary's benefit determinations and from the policies embodied in the statute.

The FMA directs the State Department "to support the secure and efficient operation of United States missions abroad" and to do likewise for foreign missions located in the United States. 22 U.S.C. § 4301(b). Achieving this goal may require the mediation of conflicts between the United States and foreign countries, a prospect that the FMA explicitly contemplates in setting forth criteria for the provision of benefits. *See* 22 U.S.C. § 4304(b)(4) (directing the Secretary to provide benefits and set terms and conditions on their enjoyment if such action is "reasonably necessary . . . to assist in resolving a dispute affecting United States interests and involving a foreign mission or sending State"). We think it would be anomalous to read the FMA as requiring the State Department to resolve disputes involving foreign missions through the designation of benefits, and yet to tie the Department's hands by limiting it to prospective solutions that may not address the sources of the conflicts.

46

In the instant case, for instance, the State Department asserted that action on its part was needed to "resolv[e] a dispute affecting U.S. interests and involving foreign governments which assert that international law requires the exemption from taxation of such diplomatic and consular properties." 74 Fed. Reg. 31,788. It seems unlikely that this disagreement—which the State Department tells us has "become a major irritant in the United States' bilateral relations and threatens to cost the United States hundreds of millions of dollars," *id.*—could be effectively resolved by the establishment of an exemption that was only forward-looking and that left the Missions on the hook for decades of property taxes along with significant back interest payments. Accordingly, we cannot read the FMA, which was intended to give the State Department flexible tools to carry out United States foreign-policy objectives, as so restricted.

**IV.**

In addition to objecting to the substance of the State Department Notice, the City also challenges the procedure by which the Notice was promulgated. Specifically, the City contends that the State Department issued the Notice without allowing first for notice and comment, and that doing so was improper. We disagree, and conclude that though the Notice is a final rule with the force of law, it is exempt from the procedural requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, because the Notice "involved . . . a . . . foreign affairs function of the United States," *id.* § 553(a)(1).

The APA provides that federal courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law . . . ." 5 U.S.C. § 706(2)(D). Section 553 of the APA generally requires notice of a proposed rulemaking in the Federal Register and an opportunity for interested persons to comment. *Id.*

47

§ 553. The Section, however, exempts from its coverage "regulations involving 'a military or foreign affairs function of the United States.'" *Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008) (quoting 5 U.S.C. § 553(a)(1)). The APA's legislative history indicates that "[t]he purpose of the [foreign affairs] exemption was to allow more cautious and sensitive consideration of those matters which 'so affect relations with other Governments that, for example, public rule-making provisions would provoke definitely undesirable international consequences.'" *Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (quoting H.R. Rep. No. 79-1980, at 23 (1946)).

We have stated that "exceptions to [section] 553 should be narrowly construed and only reluctantly countenanced." *Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995), *superseded on other grounds by statute*, 8 U.S.C. § 1101(a)(42) (internal quotation marks omitted); *see also Jean v. Nelson*, 711 F.2d 1455, 1477 (11th Cir. 1983) (citing the legislative history of the APA that indicates exceptions to notice and comment should be "construed narrowly"). We reaffirm that statement. But we find that the Notice in the case before us easily falls within the foreign affairs exception. The State Department's regulation of the reciprocal treatment to be afforded foreign missions in the United States and its conferral of benefits to the missions and consular offices of foreign governments that conduct diplomatic activities within the United States relates directly to, and has clear consequences for, foreign affairs.

The City tries to resist this conclusion by reading restrictive conditions into our prior cases dealing with the foreign affairs exception. The City argues that the exception governs only if one of two circumstances is met: either if the rulemaking does "no more than implement" a formal international agreement, *see Int'l Bhd. of Teamsters v. Peña*, 17 F.3d 1478, 1486 (D.C. Cir. 1994) (citing *WBEN, Inc. v. United* States, 396 F.2d 601, 616 (2d Cir. 1968)), or if public

48

notice and comment would provoke "definitely undesirable international consequences," such as a) the revelation of sensitive foreign intelligence, b) the impairment of relations with other countries, or c) excessive delay when urgent action is required, *see Rajah*, 544 F.3d at 437-38 (recognizing these possibilities as "at least three definitely undesirable international consequences that would follow from notice and comment rulemaking" in that particular case). Because the State Department's benefit designation in the Notice concededly does not implement a formal international agreement, the City contends that—in order for the exception to apply— we need to identify specific undesirable international consequences that would have followed from public rulemaking in this particular case.

But the City takes language from our prior cases out of context. The cases upon which the City relies addressed a quite different question than what is at issue here: the extent to which the foreign affairs exception should apply to immigration rules. The dangers of an expansive reading of the foreign affairs exception in that context are manifest. While "immigration matters typically implicate foreign affairs" at least to some extent, *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980), it would be problematic if incidental foreign affairs effects eliminated public participation in this entire area of administrative law. Reflecting such concerns, we observed in *Zhang v. Slattery* that while "[o]n occasion, courts have applied [the foreign affairs] exception to immigration rules," courts have also regularly limited the exception in this context to prevent the exception from "becom[ing] distended." 55 F.3d at 744 (internal quotation marks omitted). This approach accords with Congress's admonition in the legislative history of the APA not to interpret the phrase "'foreign affairs function' . . . loosely . . . to mean any function extending beyond the borders of the United States." S. Rep. No. 79-752, at 13 (1945); *see also* H.R. Rep. No. 79-1980, at 23 (1946).

49

By contrast, the action taken by the State Department to regulate the treatment of foreign missions implicates matters of diplomacy directly. Recognizing the applicability of the foreign affairs exceptions in this context does not raise the same concerns of loose interpretation, *see id.*, and hence the value of analogies between the instant case and immigration cases is correspondingly low. Though the foreign affairs exception extends beyond diplomacy, diplomatic functions, such as those here involved, represent the exception's paradigm case.

In short, while a case-by-case determination that public rule making would provoke "definitely undesirable international consequences," may well be necessary before the foreign affairs exception is applied to areas of law like immigration that only indirectly implicate international relations, quintessential foreign affairs functions such as diplomatic relations and the regulation of foreign missions are different. Such actions "'clearly and directly' involve a 'foreign affairs function,'" *see Mast Indus., Inc. v. Regan*, 596 F. Supp. 1567, 1582 (Ct. Int'l Trade 1984) (quoting H.R. Rep. No. 79-1980, at 23 (1946)), and so fall within the exception without a case-by-case iteration of specific undesirable consequences. To hold otherwise would turn the phrase "provoke definitely undesirable international consequences" from an illustration given in the APA's legislative history—*see* H.R. Rep. No. 79-1980, at 23 (1946) (explaining that the exception should apply only to matters which "so affect the relations of the United States with other governments that, *for example*, public rule-making would provoke definitely undesirable international consequences" (emphasis added))—into the definition for "foreign affairs function." That we are not prepared to do.

One final argument by the City against our application of the foreign affairs exception to the Notice, however, merits discussion. The City contends that the legislative history of the FMA demonstrates that Congress did not want an exemption from notice and comment to apply

to actions taken by the Department of State under this particular statute. The bills passed by both the Senate and the House of Representatives originally contained an exemption from APA rule making under section 553 for actions taken by the State Department under the FMA (except for actions taken under a section of the FMA addressing the location of foreign missions in the District of Columbia). *See* S. 854 § 208(g), *reproduced in* S. Rep. No. 97-283, at 30 (1981) (codified as enacted at 22 U.S.C. § 4308(g)) ("Except as provided in . . . 206(b), actions taken under the authority of this title shall not be considered rulemaking within the meaning of section 553 . . . ."); H.R Rep. No. 97-102, pt. 1, at 40 (1981) (describing the same provision). As explained by the Report of the Senate Governmental Affairs Committee, this exemption was included because most of the actions under the FMA were "political in nature, involving considerations of foreign policy and national security." S. Rep. No. 97-329, at 18-19 (1981). The provision was not unanimously endorsed, however. The "minority views" recorded in the Report by this committee objected to the section 553 blanket exemption. These senators argued that there were "no sufficiently compelling diplomatic reciprocity reasons for exempting the [Office of Foreign Missions] from federal rulemaking." *See id.* at 46 (minority views). For reasons that were neither explained nor even mentioned in the subsequent Conference Report, this blanket exemption provision from the APA was ultimately deleted from the final bill that Congress enacted.

The City maintains that, in light of this legislative history, we should not interpret the "foreign affairs function" exception in § 553(a)(1) to apply to the State Department's benefit designations under the FMA when Congress specifically deleted such an exception from the FMA itself. This contention has initial plausibility. But we decline to rely on the FMA's ambiguous legislative history and Congress's apparent decision not to enact an FMA-specific

51

blanket exemption from APA rules to alter what we believe is the best interpretation of these generally applicable APA rules, *i.e.*, section 553(a)(1). Subsequent organic statutes may supersede or modify APA requirements, but they must do so expressly. *See Yale-New Haven Hosp.*, 470 F.3d at 78 (citing 5 U.S.C. § 559). And we are especially reluctant to modify our application of section 553 of the APA based on what Congress did *not* say in the FMA.

**V.**

Because we hold that the State Department's Notice was a lawful exercise of the Department's power under the FMA, we decline to address the other issues originally raised in this appeal. Specifically, we take no ultimate position as to whether the Missions would have been exempt from property taxation in the absence of the Notice, either under international law pursuant to the VCCR and VCDR, or under section 418 of the New York Real Property Tax Law. We also do not address any of the questions raised regarding the District Court's calculation of damages.

**CONCLUSION**

We hold that the State Department acted within its statutory authority under the FMA in issuing the Notice. Under the Notice, the City's tax liens are invalid and no taxes on property owned by foreign governments and used to house staff of permanent missions to the United Nations or of consular posts are due and owing. Accordingly, we VACATE the opinion of the District Court. We also REVERSE the judgment of the District Court, and we REMAND to the District Court with instructions to DISMISS the actions brought against the Missions.